## HALL et al. v. RING MANAGEMENT CO.
### No. 638.

Municipal Court of Appeals for the
District of Columbia.

Dec. 28, 1948.

---

[4] Fraser v. Crounse, D.C.Mun.App., 47 A.2d 96.

Robert C. Handwerk, of Washington, D. C. (Jordan R. Bentley, of Washington, D. C., on the brief), for petitioners.

Ernest F. Henry, of Washington, D. C. (James M. Earnest and Jerome F. Barnard, both of Washington, D. C., on the brief), for respondent.

Ernest F. Williams, of Washington, D. C. (Ruffin A. Brantley, of Washington, D. C., on the brief), for Administrator of Rent Control.

Before CAYTON, Chief Judge, and HOOD and CLAGETT, Associate Judges.

CLAGETT, Associate Judge.

This case is before us on a petition brought by tenants of the Carlyn Apartments to review orders of the Administrator of Rent Control allowing increases in rent. The building in question was completed early in 1942 and contains some 270 apartment units. The present proceedings originated when the landlord filed petitions asking for increases of 7½% based on alleged increases in taxes and operating costs. About a month later some seventy tenants petitioned the Administrator for a reduction in rent. The two cases were consolidated and a hearing was had before an examiner. He took testimony and received various documents in evidence and thereafter entered his findings and recommended orders which awarded increases amounting to approximately 6.94%. Some

116, tenants petitioned the Administrator for a review of such orders but the Administrator approved them. Tenants appealed to the Municipal Court which later transferred the case to us under authority of the amended Rent Act.[1]

The tenants assign some 17 errors, all of which have been considered, but we need mention only four: (1) the failure of the examiner and the Administrator to make detailed findings of fact showing the basis for the rental increase allowed; (2) the failure of the examiner and the Administrator to make allowance for the fact that the expenses for the last year of operation were not typical; (3) the failure of the examiner and the Administrator to reduce rentals because of the decrease or abandonment of certain services; and (4) the refusal of the examiner and the Administrator to consider evidence showing an income from a garage located in the building and used and paid for by some of the tenants.

■ (1) and (2). The general pattern of procedure adopted by the examiner and the Administrator in the present case was the same as that followed in Winkler v. Ballard, 63 A.2d 660, decided by us December 22, 1948. With respect to the merits of the case, the examiner and the Administrator compared the operating expenses for the last year of operation with those for the first year and granted an increase in rentals sufficient to produce in full the increase in expenditures determined by such method. This was the method urged by the landlord in Winkler v. Ballard but rejected in that case by the examiner and the Administrator, who in lieu of such method averaged the operating expenses over the period involved and used such average figure as the basis for the increase determined upon. In the present case the tenants pointed out particularly that the redecoration of apartments was done only at an interval of several years and hence that in such years the expense figures were not typical. They made other similar objections to using the last year of operation as a test year. We need not here repeat what we have already said in Winkler v. Ballard either on the procedural question or

1 Code 1940, 45—1609, as amended April 29, 1948, 62 Stat. 205, 206.

on the method used by the office of the Administrator in deciding applications for rent increases. For the reasons stated in Winkler v. Ballard, the order of the Administrator is reversed and the case remanded for further action in accordance with the views expressed herein and in Winkler v. Ballard.[2]

(3) The tenants also complain that the examiner and the Administrator should have reduced the rentals on the ground that the various services making up the minimum service standard had either been reduced or never furnished. On this point the examiner found that such reduction in service which occurred did not form sufficient basis for an adjustment of the maximum rent ceiling. We believe that this finding is supported by substantial evidence and hence will not be disturbed.

(4) The tenants also complain that the landlord derived a large amount of income from garage space located in the apartment building and yet did not include such income in the total rentals and that the Administrator likewise did not take these rentals into account in granting an increase. The position of the tenants is that if the garage income were included the apartment rentals should be decreased instead of increased. The figures indicate that whereas operating expenses increased approximately $20,000 between 1942 and 1947 the landlord in years prior to 1947 received approximately $23,000 for garage rent and charges plus $10,800 for increase in such items in the year ended June 30, 1947, or a total income in that year from such sources of $33,840.

As already indicated, the Carlyn was completed in February 1942. As required by the Rent Administrator's regulations, the management filed rent schedules of the first charges for the apartments in the buildings May 15, 1942. October 31, 1942 additional rent schedules were filed for apartments which the management had originally intended to rent to transients. Each of these rent schedules gave the monthly rental for each apartment. Such rent schedules also, under the heading "service furnished", included "garages". However, in a separate column for services furnished "with rent" there were included various services such as electricity, refrigerator, heat, hot water, and telephone, but in this list garage was not included.

The record indicates that of 271 apartments of the Carlyn there are 120 tenants who rent garages and 150 who do not. The reason for this situation, at least partially, is that there is not sufficient garage space for all tenants. We assume, also, that some of the tenants do not own automobiles. The record shows that originally the landlord made an extra charge for the garage space of $11 per month per car plus a garage service charge of $5 per month, or a total of $16 per month, and that beginning October 1, 1947 these charges were increased to $16 per month for garage rental plus $7.50 per month for garage service, or a total of $23.50 per month. The examiner made separate findings on the landlord's petition for increased rentals and on the tenants' petition for decreased rentals. The findings on the landlord's petition included one that the services "supplied by the landlord in connection with" the rent included "garage" originally, and the examiner's recommended order which was approved by the Administrator provided that the new rentals were with "the minimum service standard as described above." However, in the examiner's findings on the tenants' petition there was included a finding: "5. That garage space is not a part of the minimum service standard for the housing accommodations herein."

While these findings are apparently inconsistent, we do not believe that their effect is necessarily so. It is possible that a landlord may be required by his schedules to "furnish" a particular service such as a garage and yet be permitted to charge extra therefor. There is no requirement in the Rent Act that rentals must be stated as one figure, and the original schedules filed by this landlord and approved by the Administrator showed clearly that a charge for garage service was not included in the

2 See In re Recommendation of Local Advisory Board of San Antonio Defense—Rental Area for Decontrol of Bexar County, Texas, Em.App., 169 F. 2d 955, decided September 22, 1948.

apartment charge. In any event the record is clear that as to this apartment an extra charge has always been made for garage space and thus that such charges were not included in apartment rentals.

■ It follows, we believe, that the Administrator was correct in holding that the garage rentals have no bearing upon whether the apartment rentals should be increased or on the amount of such increase. Under the local Rent Act the Administrator is not concerned with net income from housing accommodations. He is concerned only with increasing rents sufficiently to "compensate" in whole or in part for increased operating expenses. The method of calculation urged both by the petitioner and respondent and adopted by the Administrator was to determine the amount of increased operating expenses and then sufficiently increase apartment rentals to provide that amount of money. In order to apply a percentage increase, it was necessary for the Administrator to compare the money increase arrived at with the total apartment rentals of $287,670. It results that the only way in which use was made of income was in arriving at the percentage increase for each apartment. It is obvious, therefore, that if in arriving at such percentage of rental increases there were added to the total apartment rentals the income from garages, a smaller percentage increase on apartment rentals would be arrived at but that the amount of actual money obtained by the landlord from apartment rentals would be less than the amount decided by the Administrator to be necessary. This is true because the percentage increase would not be applied to the income derived from the garage.

A further result of taking the garage rentals into account in determining an apartment rent increase would be that the tenants who rented no garage would be obtaining the benefit of garage rentals paid by others, and to the same extent those who paid for garages would be helping to pay the apartment rentals of those who did not.

■ What was actually done by the Administrator in connection with the garage was to make an allotment of certain limited expenses paid on account of the building as a whole and deduct from the general operating expenses a figure of $689.38, which he determined to be the part of such general expenses attributable to the garage. In addition certain direct garage expenses were not included in the general figure. In principle this method seems to us to be correct, but we believe that the amount of the expenses attributable to the garage should be reconsidered by the Administrator in connection with the general reconsideration of the case found by us to be necessary. It is difficult for us to believe that a property producing an income of $33,840 per annum is chargeable with only $689 of the general expenses of the building. For example, the general expenses include more than $9,000 per annum for elevator operators, and there is no indication that any part of this was allocated to the garage. The same is true of several other important items.

In this connection we emphasize that we do not pass upon the question of whether the landlord had the right under the Rent Act to increase the garage rentals without the prior approval of the Rent Administrator. That question has not been presented nor argued.

Reversed.

CAYTON, Chief Judge (concurring).

I agree that the decision of the Administrator should be reversed on grounds (1) and (2) outlined and discussed in the foregoing opinion. And I also agree with what is said as to point (3). But I think reversal should also be predicated upon the refusal of the Administrator to consider or take into account the $33,840 which the landlord collected from tenants during the past year for garage rent and garage service. This was not income from a strictly commercial portion of the building. It was income derived from garage space furnished to tenants as a direct incident of their tenancies. Whether such space was a facility or service within the meaning of the Rent Act we need not now decide; but I am quite clear in my belief that income from such a source could not properly be ignored. I think it was error for the examiner and the Administrator to refuse to take this substantial sum into account in study-

ing the financial picture involved and in weighing landlord's claim for an increase and tenants' demand for a reduction in rent.

HOOD, Associate Judge (dissenting).

I agree with the Court with respect to points 3 and 4 in its opinion, but for the reasons stated in my dissent in Winkler v. Ballard, D.C.Mun.App., 63 A.2d 660, I disagree with points 1 and 2. In the Winkler case the Administrator determined rise in costs by comparing the base year with the average of succeeding years. In this case he eliminated intervening years and compared the base year with the last year. In both cases the Court reverses, apparently disapproving both methods. The Court leaves unanswered the following questions. What are the defects in either or both of the methods used? What method should be used? May any method or formula be used or must there be exact calculation in each case, item by item? Does the Administrator have any discretion in selecting his method of calculating increased costs? Does he have any discretion in granting increase in rents? I think these questions should be answered.