**SHARPE et al. v. GOLDWYN et al.**

No. 750.

Municipal Court of Appeals for the
District of Columbia.

March 18, 1949.

John Cabot White, of Washington, D. C.
(Renah F. Camalier, of Washington, D. C.,
on the brief), for petitioners.

Harry J. Kane, Jr., of Washington, D.
C., for respondents.

Ernest F. Williams, of Washington, D.
C. (Ruffin A. Brantley, of Washington, D.
C., on the brief), for Administrator of
Rent Control.

Before CAYTON, Chief Judge, and
HOOD and CLAGETT, Associate Judges.

CLAGETT, Associate Judge.

Petitioners, who are tenants at the Chalfonte Apartment House at 1601 Argonne
Place, N. W., brought this proceeding to
review an order of the District of Columbia Rent Administrator[1] by which he increased the rents on the several apartments.
The landlord and the Rent Administrator
appeared in defense of the order.

Based upon a total annual rental for the
calendar year beginning January 1, 1941,
of $130,145, the landlord requested an increase of 16.5% to compensate for alleged
additional operating expenditures, including real estate taxes and water rents, of
approximately $20,000 between 1941 and
1947.[2] The tenants urged that increased

[1] Code 1940, Supp. VI, § 45—1604(b).

[2] The parties apparently agreed that
1941 should be taken as the base year.

expenditures justified a maximum rent increase of only 6.2%, or an increase of approximately $8,100 distributed over the various apartment units. The order of the Administrator granted an increase of $12,660, or approximately 10%.

Petitioners submitted to the Administrator a table of operating expenses for the years 1941-47, inclusive, based upon the landlord's books and itemized in categories which they conceded represented true operating expenses. Such figures showed operating expenses for 1941 of $52,894.92, and $65,482.26 for 1947, or an increase of $12,587.34. Such operating expenses for the years 1942-47, inclusive, averaged $58,254.60, or an increase over 1941 of $5,359.68. In arriving at such figures petitioners eliminated various items in different years, including 1947, which they claimed represented replacements of capital assets and other items which they urged did not represent true operating expenses. Included in such items eliminated by petitioners were expenditures in 1944 for the replacement of rugs and furniture, expenditures in 1946 and 1947 for replacements of worn-out refrigerators, and an expenditure in 1947 of $5,176.50 for installing oil burners to replace worn-out automatic coal stokers. Treating all such items as operating expenses, the total in 1941 was $52,894.92, and for 1947 was $72,544.06, or an increase of $19,649.14. So treated, the average expenditures for the years 1942-47, inclusive, were $61,070.31, or an increase of $8,175.39 over 1941.

■ During the hearing, petitioner objected to several specific rulings by the examiner. The first of such rulings had to do with an item of $2,100 in 1943, of which $1,000 was a fee paid to an attorney for the dissolution of a corporation formerly owning the building, and the balance of $1,100 was for refinancing a mortgage. Apparently the examiner ruled that the legal fee was not an operating expense but that the item for refinancing the mortgage was an operating expense. It seems obvious that the first ruling was correct and that the second ruling was incorrect. Both were ownership items which were not chargeable against rents so far as the purposes of the Rent Act are concerned. In the view that

we take of the case, however, both rulings were immaterial since there was no such expenditure in 1941 or 1947. Another ruling by the examiner had to do with the expenditure of $1,464.91 in 1946 and $1,698.50 in 1947 for new electric refrigerators and an expenditure of $5,176.50 for new oil burners. The testimony was that the apartment house contained one electric refrigerator in each apartment, or 200 in all, that each had a life of ten years, and that the program of the management was to replace 20 each year, although only 12 were replaced in 1946 and 14 in 1947. The examiner apparently ruled that such expenditures should not be treated as capital improvements. We find no error in this ruling. With respect to the replacement of the worn-out automatic stokers by new oil burners, the examiner ruled that "It will be considered as a capital expense, but it may not necessarily mean that the whole thing is going to come out." Just what method was followed by the examiner with regard to this item is not disclosed by the record except to the extent mentioned hereinafter.

■ As in previous cases wherein orders of the Administrator have been reviewed by us, the findings of the examiner were confined to general determinations, reciting the rent ceiling on each apartment on January 1, 1941, a recital of the services supplied by the landlord in connection with the rent, a statement that the premises had been inspected by the examiner and a general finding that "The expenses borne by the landlord, including taxes and water rent, have increased substantially and form a proper basis for adjustment of the maximum rent ceiling to compensate therefor to the extent recommended herein, in accordance with the intent and purpose of the District of Columbia Emergency Rent Act." One additional general finding was made in this case (probably referring to the oil burners mentioned just above) to the effect "That there has occurred a substantial capital improvement, which forms a proper basis for adjustment of the maximum rent ceiling to compensate therefor to the extent recommended herein, in accordance with the intent and purpose of the District of Columbia Emergency Rent Act." We

do not agree that the furnace replacement was a "capital improvement" but here again we believe the error immaterial for the reasons stated below.

In the Administrator's brief it is stated that during the hearing the examiner announced that he would use what has become known as the "averaging method" in computing the increase to be allowed but that since this announcement was made "off the record" it was not included in the record on appeal. In the Administrator's brief it is also urged that "it is not necessary or proper to have the Examiner's findings set forth in the nature of a balance sheet."

█ The Administrator's order was issued prior to our decisions in several rent appeal cases in which we pointed out the inadequacy of findings similar to those made in the present case.[3] Subject to the reservations stated by us in Winkler v. Ballard, D.C.Mun.App., 63 A.2d 660, we believe that the following statement by the Supreme Court in Beaumont, S. L. & W. R. Co. v. United States, 282 U.S. 74, 86, 51 S.Ct. 1, 6, 75 L.Ed. 221, is applicable:

"The Commission's [Interstate Commerce Commission] failure specifically to report the facts and give the reasons on which it concluded that under the circumstances the use of the average or group basis is justified leaves the parties in doubt as to a matter essential to the case, and imposes unnecessary work upon the courts called upon to consider the validity of the order. Complete statements by the Commission showing the grounds upon which its determinations rest are quite as necessary as are opinions of lower courts setting forth the reasons on which they base their decisions in cases analogous to this. * * * A sound basis for the rule or formula prescribing the divisions is essential to compliance with the act."

We have also stated previously that in our opinion the proper method to be used in administering the Rent Act is that the examiner and the Administrator should consider the various items of operating expenses for the base year and for the last year of operation and should make such

adjustments as are necessary based upon expenses for the intervening years and other relevant data. Shapiro v. Bombardier, supra.

█ In the present case, however, the landlord has accepted the Administrator's determination and the tenants have assumed the burden of showing that the rent increase granted was too high. They have not carried this burden. As already pointed out, the operating expenses of this apartment house for 1947, ignoring expenditures for the replacement of furniture, refrigerators and furnaces, exceeded the 1941 operating expenses by $12,587, which was approximately the same increase in rentals recommended by the examiner and approved by the Administrator. The only disputed item in such calculation was the expenditure in 1947 of $8,692 for coal and oil, which exceeded by more than $2,000 the expenditures for fuel in any previous year. The landlord himself blamed the high fuel cost in 1947, in part at least, upon the unusually severe winter of 1947-48. While we believe that for this reason the Administrator was entitled to make an adjustment in the 1947 fuel cost on this account, we also believe that other proper allowances on account of replacements and other items would have more than compensated for a proper adjustment on the fuel figure.

We do not believe that other errors assigned by petitioners require detailed discussion. With respect to the claim that proper weight was not given to evidence that minimum service standards in effect January 1, 1941, had either been abandoned or reduced materially in later years, we conclude that the figures mentioned above do take into account such evidence. For example, included in the operating expenses for 1947 is only $880 on account of maintenance and repairs of tenants' apartments, whereas the amounts spent on account of this item were considerably larger in each previous year and was $7,357 in 1945. The figures we have used credit the landlord with only the actual 1947 expenses and thus the tenants have received the benefit

---

[3] Winkler v. Ballard, D.C.Mun.App., 63 A.2d 660; Hall v. Ring Management Co., D.C.Mun.App., 63 A.2d 656; Proctor v. Miller, D.C.Mun.App., 63 A.2d 665; Shapiro v. Bombardier, D.C.Mun.App., 63 A.2d 772.

of such low expenditures by corresponding low rentals.

Affirmed.

HOOD, Associate Judge, concurs in the result.