BEAUMONT, SOUR LAKE & WESTERN RAILWAY COMPANY ET AL. *v.* UNITED STATES ET AL.

UNITED STATES ET AL. *v.* BEAUMONT, SOUR LAKE & WESTERN RAILWAY COMPANY ET AL.

Nos. 44 and 45. Argued October 20, 1930.—Decided November 24, 1930.

*Messrs. F. H. Moore* and *Samuel W. Moore,* with whom *Messrs. W. E. Davis, E. T. Miller, M. G. Roberts, J. R.*

*Bell, G. H. Muckley, H. H. Larimore, C. S. Burg, J. R.
Turney,* and *Robert Thompson* were on the brief, for the
Southwestern Lines.

*Mr. E. M. Reidy,* with whom *Solicitor General Thacher,
Assistant to the Attorney General O'Brian, Messrs.
Charles H. Weston,* Special Assistant to the Attorney
General, and *Daniel W. Knowlton* were on the brief,
for the United States and the Interstate Commerce
Commission.

*Mr. Frank H. Towner,* with whom *Messrs. Silas H.
Strawn, P. F. Gault, K. F. Burgess, Ralph M. Shaw, J.
Carter Fort, G. M. Swanstrom, A. H. Lossow, K. L.
Richmond,* and *L. H. Strasser* were on the brief, for the
Western Trunk Carriers.

Mr. Justice Butler delivered the opinion of the Court.

This is a suit brought in the District Court for the
Western District of Missouri by appellants, carriers in
southwestern territory, against the United States to annul
and set aside an order of the Interstate Commerce Com-
mission prescribing divisions of joint rates applicable to
certain freight traffic between points in that territory and
points in western trunk line territory or via western lines
to and from points in eastern territory. The Commission
and certain western trunk line carriers intervened. The
case was tried before a court of three judges. 28 U. S. C.,
§ 47. It sustained the order and dismissed the petition.
36 F. (2d) 789. The southwestern lines appealed. 28
U. S. C., § 345 (4). The court stayed the enforcement of
the prescribed divisions until determination here. The
United States and Interstate Commerce Commission
appealed from that order.

The Commission's order complained of was made in pro-
ceedings, instituted October 8, 1923, by the Commission

on its own motion. Its report defines western trunk line territory to include Iowa, Minnesota, Wisconsin, the Upper Peninsula of Michigan, Illinois, North Dakota, South Dakota, and that part of Missouri on and north of the main line of the Missouri Pacific between Kansas City and St. Louis; it defines the southwestern territory to include Texas, Arkansas, Oklahoma, that part of Louisiana west of the Mississippi river, and so much of Missouri as is south of the above mentioned line of the Missouri Pacific.

Twelve western trunk lines and thirty-two southwestern lines were parties to this investigation. The former, carriers in that territory having little or no mileage in the southwest, demanded increases and were by the Commission called complainants; the latter, carriers in the southwest having little or no mileage in the other territory, merely sought to retain the existing divisions and were called defendants. The Santa Fe and Rock Island, named as defendants, have important lines in both territories. The former regarded itself as a southwestern carrier; the latter remained neutral. The investigation was as to the reasonableness of divisions of joint rates on freight traffic between points on lines of respondents in southwestern territory and points on lines of respondents in western trunk line territory moving through Kansas City or St. Louis in Missouri, East St. Louis, Cairo, Gale or Thebes in Illinois, and of divisions of the joint rates accruing to respondents on traffic moving through such gateways between such points in southwestern territory and points in eastern territory that lie east of the Illinois-Indiana state line.

The Commission made a report (148 I. C. C. 457) in which among other things it found (p. 477):

Existing divisions were established for the most part about 35 years ago and conform to no logical or consistent basis. They are considerably more favorable to the western trunk lines in case of oil and lumber than in case of

other traffic. Transportation conditions have changed materially since most of the divisions were established and the changes have benefited the southwestern lines more than they have those in the other group. And the trend is distinctly in favor of the former. In respect of density of traffic, transportation conditions are more favorable in western trunk line territory, but conditions vary in different parts of that territory and are considerably more favorable in Illinois than in the other States included in that region and are progressively less favorable from east to west. The difference in transportation conditions is reflected in the level of rates in the two territories. It is not possible from the record to determine just what the average difference is but it appears to be greater than the difference in average transportation conditions. This is particularly true of the class rates which are constructed upon somewhat different theories in the two territories and are in process of revision in the western trunk line territory. The cost of operation per ton mile including all expenses, charges and a fair return on investment probably does not average as much as 20 per cent higher in the southwestern territory than in the other group. On the whole the financial condition of the western trunk lines is not as good as that of the southwestern lines.

The report continues (p. 478):

" The divisions here in issue are dealt with of record on a group basis. They are, in other words, the divisions ' in the aggregate' north and south of the gateways named, and no question is raised with respect to the divisions of individual carriers. In our opinion the divisions in issue are not just, reasonable, and equitable. Many of them are unjust to complainants, and some of them are unjust to defendants. To cure their defects, they must be readjusted upon a consistent basis which will as nearly as practicable reflect, in the light of all the facts of record, the differing conditions in the two territories."

The Commission found that divisions for the future should be made as follows: The joint rates applicable to traffic moving to or from points in Illinois and Wisconsin should be divided in the proportions that the first-class rate on the southwestern scale for the length of haul south of the gateway and 80 per cent. of such rate for the length of haul north of the gateway, respectively, bear to the total of such assumed rates.    Similarly, the joint rates on traffic to or from other points in western trunk line territory should be divided by taking for the northern haul 87 (instead of 80) per cent. of such assumed rate. The western trunk lines' share of joint rates applicable on the traffic to or from points in the territory east of the Illinois-Indiana line should be determined in like manner on the basis of 80 per cent. of the assumed rate for the northern haul and by deducting 10 cents from that portion.    Where differentials are used in the construction of the joint rates, they should be deducted before prorating and added to the division accruing to the carriers in the region where they apply.    These rules or formulas were made subject to some exceptions which need not be given.

The report states that the assumed rates are intended to reflect general differences in transportation conditions. The factor of 80 per cent. gives the southwestern carriers an advantage of 25 per cent., and the use of 87 per cent. makes a difference in their favor of about 15 per cent. The Commission found that complexity in the bases to be employed is not desirable, that the differentiation provided for would produce sufficiently accurate and reasonable results and that divisions made in the manner specified will for the future be just, reasonable and equitable.

The southwestern lines presented a petition for rehearing which was denied.   But the Commission made an additional report, 156 I. C. C. 94, and modified its findings as to joint rates applicable to traffic to and from points

in Illinois and Wisconsin or in the eastern territory by changing the factor attributable to the haul north of the gateways other than Kansas City from 80 to 75 per cent. of the assumed rate, and by increasing from 10 cents to 15 cents the amount to be deducted from the western lines' proportion of joint rates applicable to and from points in eastern territory.

On the same day that it announced its second report, June 10, 1929, the Commission made the order. As to the joint rates in question, it directs that the " just, reasonable and equitable divisions in the aggregate north and south of said gateways " shall be made in accordance with the findings and formulas above mentioned. Divisions made on the bases prescribed, while decreasing the western trunk lines' shares on some shipments, will increase them on many more, and it is estimated that the order will operate to give those lines about $3,000,000 annually, over and above what would be yielded to them under existing divisions. This is much less than one per cent. of the total freight operating revenues of the southwestern carriers.

The appellants contend that the Act requires the Commission to determine the divisions of each carrier upon a consideration of its own rights and needs, and does not authorize the Commission to base its order upon group conditions or upon average conditions in the group.

Section 15 (6) provides that whenever, after full hearing, the Commission is of opinion that divisions of joint rates are or will be unjust, unreasonable, inequitable or unduly preferential or prejudicial as between parties thereto, the Commission shall by order prescribe the just, reasonable and equitable divisions thereof to be received by the several carriers. " In so prescribing and determining the divisions of joint rates, fares and charges, the Commission shall give due consideration, among other

things, to the efficiency with which the carriers concerned are operated, the amount of revenue required to pay their respective operating expenses, taxes, and a fair return on their railway property held for and used in the service of transportation, and the importance to the public of the transportation services of such carriers; and also whether any particular participating carrier is an originating, intermediate, or delivering line, and any other fact or circumstance which would ordinarily, without regard to the mileage haul, entitle one carrier to a greater or less proportion than another carrier of the joint rate, fare or charge." 49 U. S. C., § 15 (6).

The facts specified above and others necessarily or properly to be taken into account are to be considered having regard to the duty of the Commission, § 15a (2), to establish and adjust rates so that the carriers as a whole in each rate group or territory that the Commission may designate will, under management and expenditures such as are there specified, earn as nearly as may be a fair return upon the aggregate value of their operating property.

The Commission by § 15 (6) is required to consider the condition of each carrier and to determine whether the division of each joint rate is unreasonable or otherwise repugnant to the specified standards and what division will for the future be just, reasonable and equitable. *United States* v. *Abilene & So. Ry. Co.*, 265 U. S. 274, 291. The Commission may not change an existing division unless it finds that division unjust or unreasonable. *Brimstone R. R. Co.* v. *United States*, 276 U. S. 104, 115. Cf. *Interstate Commerce Commission* v. *Louisville & Nashville R. R.*, 227 U. S. 88, 92. But it need not under all circumstances take specific evidence as to each rate of every carrier. When considering divisions of numerous joint rates applicable to traffic passing through gateways between different territories the Commission may

make the required determinations and establish the bases for divisions between groups of carriers in the respective territories upon evidence which it reasonably may deem typical and to have sufficient probative weight to justify the necessary findings and the order in respect of each rate. That is to say, such typical evidence may sufficiently disclose the facts necessary to enable the Commission duly to consider the divisions of each joint rate to be received by every carrier. *New England Divisions Case,* 261 U. S. 184, 191, 196, 199. *Brimstone R. R. Co.* v. *United States, supra,* 116.

The evidence before the Commission is sufficient to disclose as to each carrier all the facts specified in § 15 (6) and to furnish an adequate and reasonable basis for the proper division of each of the joint rates applicable to the traffic here involved. The mere fact that carriers and divisions were dealt with on an average or group basis does not indicate that the Commission did not properly consider each carrier and rate or that it did not duly take into account the facts specified in § 15 (6) or that it failed to obey the statute in any respect.

Appellants assert that the order is based solely upon a comparison of average conditions of widely dissimilar carriers comprising each group and that its enforcement will bring about divisions so unjust and arbitrary as to be beyond the Commission's power. They show by the record that in each group there are carriers that earn little or no return, others that earn substantial amounts and some that make relatively high returns. They strongly emphasize that the prescribed divisions will operate in some instances to transfer substantial sums from very weak carriers in southwestern territory to prosperous ones in western territory, and insist that mere comparison of returns demonstrates that divisions on a group basis will be unjust and arbitrary. It seems to us that the table

included in the first report (p. 476), and others received in evidence [1] show as between individual carriers in each

[1] The Commission found that rates of return for individual carriers, namely, the principal Chicago-St. Louis and Chicago-Kansas City lines and the prominent southwestern lines, were as follows in 1922 to 1925, inclusive:

| | 1922 Per Cent | 1923 Per Cent | 1924 Per Cent | 1925 Per Cent |
|---|---|---|---|---|
| Western Trunk Lines: | | | | |
| Chicago & Alton | 1.05 | 3.59 | 2.86 | 2.87 |
| C. & E. I. | 3.03 | 3.82 | 1.62 | 2.37 |
| C. B. & Q. | 4.52 | 4.29 | 4.80 | 4.60 |
| C. G. W. | .19 | 1.54 | 1.59 | 1.48 |
| C. M. & St. P. | 1.90 | 2.81 | 2.57 | 2.27 |
| Illinois Central | 5.92 | 5.17 | 4.76 | 4.76 |
| Wabash | 1.77 | 3.84 | 3.85 | 4.84 |
| Southwestern Lines: | | | | |
| A. T. & S. F. | 4.61 | 5.17 | 4.63 | 5.16 |
| G. C. & S. F. | 6.05 | 5.67 | 9.04 | 7.55 |
| H. & T. C. | 4.30 | 4.44 | 5.28 | 4.33 |
| H. E. & W. T. | 2.26 | 1.75 | 1.91 | 7.21 |
| I. G. N. | 2.87 | 4.98 | 5.63 | 4.52 |
| K. C. M. & O. | Deficit | .22 | Deficit | .24 |
| K. C. M. & O. of Texas | Deficit | Deficit | 2.41 | .47 |
| K. C. S. | 2.88 | 2.60 | 2.85 | 3.49 |
| M. K. T. | 4.72 | 3.78 | 4.29 | 4.96 |
| M. K. T. of Texas | 1.63 | 1.56 | 5.03 | 3.28 |
| Mo. Pac. | 2.09 | 2.21 | 3.81 | 4.14 |
| St. L. S. F. | 3.99 | 4.72 | 5.05 | 5.23 |
| St. L. S. W. | 7.05 | 7.44 | 4.97 | 4.81 |
| St. L. S. W. of Texas | Deficit | Deficit | 1.33 | 1.46 |
| Texas & Pacific | 2.72 | 3.84 | 4.15 | 4.11 |

The appellants in their brief suggest that the record shows similar data as to other carriers who were respondents before the Commission:

| | Rate of Return | | | |
|---|---|---|---|---|
| | 1922 Per Cent | 1923 Per Cent | 1924 Per Cent | 1925 Per Cent |
| Western trunk line respondents: | | | | |
| Chicago & Northwestern Ry. Co. | 3.47 | 3.04 | 3.23 | 4.14 |
| Chi., St. P., Mpls. & Omaha | 4.11 | 3.32 | 3.73 | 3.46 |

group so wide a range of rates of return that, if approximate similarity in that respect is essential to the order, its basis cannot be sustained.

"Average" as used in the report manifestly is not intended to refer to an arithmetical calculation, the quo-

| | Rate of Return | | | |
|---|---|---|---|---|
| | 1922 | 1923 | 1924 | 1925 |
| Western trunk line respondents—Con. | Per | Per | Per | Per |
| Minneapolis & St. Louis.......... | 1.32 | 1.22 | Deficit | .36 |
| Mpls., St. P. & S. Ste. Marie...... | 3.31 | 3.75 | 3.04 | 4.10 |
| Q., O. & K. C. R. R............... | Deficit | Deficit | Deficit | Deficit |
| Southwestern respondents: | | | | |
| Gulf Coast Lines................. | 6.85 | 8.52 | 9.68 | 9.79 |
|    The Beaumont, Sour Lake & West. Ry. Co. | | | | |
|    New Orleans, Tex. & Mexico Ry. Co. | | | | |
|    St. Louis, Brownsville & Mex. Ry. Co. | | | | |
| Ft. Worth & Denver City Ry. Co.. | 7.40 | 8.63 | 10.52 | 9.19 |
| Sou. Pac. Lines in Tex. and La.... | 2.35 | 2.43 | 3.97 | 3.27 |
|    Galveston, Harrisburg & S. A. Ry. Co. | | | | |
|    Houston & Shreveport R. R. Co. | | | | |
|    Louisiana Western R. R. Co. | | | | |
|    Morgan's La. & Tex. R. R. & S. S. Co. | | | | |
|    Texas & New Orleans R. R. Co. | | | | |
|    *Houston & Tex. Central R. R. Co. | | | | |
|    *Houston East & West Tex. R. R. Co... | | | | |
| Kansas, Okla. & Gulf Ry. Co..... | 2.80 | 1.31 | .17 | Deficit |
| Louisiana Ry. & Navigation Co.... | .39 | Deficit | Deficit | Deficit |
| San Antonio & Aransas Pass Ry... | .95 | 3.12 | 2.71 | ** |
| Vicksburg, Shreveport & Pacific... | 3.39 | 6.16 | 4.00 | 5.01 |

*The rates of return of the Houston & Texas Central R. R. Co. and Houston East & West Texas R. R. Co. were shown in the Commission's table, but the rates of return for the other respondents which form parts of the Southern Pacific System were excluded.

**Included as part of Southern Pacific Lines in 1925.

tient of a sum divided by the number of its terms. It is rather to be understood as an estimated general mean of the conditions of the several carriers constituting each group arrived at by the exercise of judgment upon the facts shown by the evidence. The reports satisfactorily show that the findings as to average group conditions taken as a whole are sustained by substantial and persuasive evidence. But they do not deal with the important question whether, under the evidence and having regard to the wide dissimilarities between rates of return earned by individual carriers in each territory, the use of the average or group basis is justified and whether it will produce unreasonable divisions. The general statements in the reports to the effect that the Commission in reaching its conclusions considered all the pertinent evidence add nothing to the prima facie presumption that generally attends determinations of the Commission. *Bluefield Co.* v. *Public Service Commission,* 262 U. S. 679, 688-689.

The Commission's failure specifically to report the facts and give the reasons on which it concluded that under the circumstances the use of the average or group basis is justified leaves the parties in doubt as to a matter essential to the case and imposes unnecessary work upon the courts called upon to consider the validity of the order. Complete statements by the Commission showing the grounds upon which its determinations rest are quite as necessary as are opinions of lower courts setting forth the reasons on which they base their decisions in cases analogous to this. *Wichita R. R.* v. *Public Utilities Commission,* 260 U. S. 48, 58. And we have recently emphasized the duty of such courts fully to state the grounds upon which they act. *Virginian Ry.* v. *United States,* 272 U. S. 658, 675. *Lawrence* v. *St. Louis-San Francisco Ry.,* 274 U. S. 588, 591–592. *Arkansas Commission* v. *Chicago, R. I. & P. R. Co.,* 274 U. S. 597, 603. *Hammond* v. *Schappi Bus Line,* 275 U. S. 164, 171. *Cleveland, C., C.*

*& St. L. Ry.* v. *United States,* 275 U. S. 404, 414. *Baltimore & Ohio R. Co.* v. *United States,* 279 U. S. 781, 787. And the Commission is not excused by the fact that the carriers presented evidence on a group basis or by the omission of the southwestern lines in their petition for a rehearing to object to the use of averages. The proceedings before the Commission were for the determination of what divisions are and for the future will be reasonable. Here the issue is whether the Commission's amended determinations and the order based on them are valid. Appellants are not estopped from assailing the averages or groups adopted. A sound basis for the rule or formula prescribing the divisions is essential to compliance with the Act.

With this criticism of the reports, we turn to what is shown by the record. A study of the facts that may be gleaned from the latter leads to the opinion that, notwithstanding the wide differences in rates of return between carriers the basis adopted will not, at least on that account, result in unjust and unreasonable divisions. The Commission must consider the financial condition of the carriers but it is not required to make that the only test. And it did not take the average of the rates of return as the sole or principal factor for making the divisions. As to each carrier, operating and other conditions were shown and presumably considered by the Commission in deciding whether average or group conditions might appropriately be used. It is not shown that the order will require any service to be rendered at less than cost. It is impossible to make divisions that will yield the same rate of profit to each carrier or upon every commodity or shipment moved by it. The average cost of service was apparently given much weight. It is not suggested that the operating expenses of each carrier attributable to the traffic in question vary as does its rate of return on its business as a whole. Nor does it appear that the

carriers having the highest rates of return from their total business or from that in the territory in which they belong, move the traffic in question at comparatively low costs. Returns from total business of a carrier and the cost of handling the traffic covered by the joint rates are not dependent upon the same facts; the relation between them is slight and remote. For aught that appears the carriers having little or no return on their total business may move the traffic in question at low costs and realize a satisfactory percentage of profit on that part of their business.

Other things being equal, divisions made on the mileage basis will be the same as those made on the basis of relative costs. The Commission found that existing divisions give southwestern lines over 30 per cent. more than their mileage prorate and the order leaves them substantially more than would divisions on that basis. This indicates that the Commission considered the relatively high costs at which the southwestern lines, or some of them, moved the traffic in question. The fact that average conditions affecting cost of transportation in the two groups have changed and are still growing more favorable to the southwestern lines tends to justify a reduction of their existing divisions. The greater density found in western trunk line territory makes for lower costs, and that is shown to have been taken into account. Appellants have not sustained their contention.

Appellants claim that the Commission's order, if enforced, will operate to deprive them of their property without due process of law in violation of the Fifth Amendment to the Constitution.

It is well-established by the decisions of this court that, in order to invoke such constitutional protection, the facts relied upon to prevent enforcement of rates prescribed by governmental authority must be specifically alleged and from them it must clearly appear that the enforcement

of the measure complained of will necessarily deny to the utility the just compensation safeguarded to it by the Constitution. *Aetna Insurance Co.* v. *Hyde,* 275 U. S. 440, 447–8, and cases cited. Here the joint rates themselves are not assailed as too low, but the claim is that the prescribed divisions are confiscatory. The same rules as to pleading and proof apply to orders prescribing divisions as to laws fixing rates. There is no allegation in the complaint, or evidence in the record to show, that any division to any of the appellants will not yield operating expenses chargeable to the service covered by it plus a reasonable return on property value fairly attributable to that service. There is no foundation in the record for the contention.

Appellants contend that the provision of the order that applies to the division of revenue derived from traffic between points in the eastern territory and points in the southwestern territory is unlawful because the eastern carriers were not before the Commission and for lack of evidence to show whether the divisions received by them are just.

Section 15 (6) empowers the Commission to determine and prescribe divisions of joint rates " as between the carriers parties thereto " and requires it when so doing to consider the condition and needs of each participating carrier. The eastern carriers are parties to the joint rates covering the whole movement. The reasonableness of such rates is not involved. Every carrier, and there may be many, participating in the haul is entitled to its just share. The record, and especially testimony given in the District Court, shows that there is and long has been a primary division of such joint rates, one part for the carriers participating in transportation east of the Mississippi river and the other part for those hauling to or from that point. Cf. *Terminal R. R. Assn.* v. *United States,* 266 U. S. 17, 30. The proceedings here under considera-

tion involve only the subdivision of that part of the revenue accruing to southwestern lines and western trunk lines for service performed west of the "breaking" point at Mississippi river crossings. The eastern carriers are not at all concerned in this subdivision. In proceedings concerning subdivisions of revenues assigned to the western part of the service, it is competent for the Commission to assume validity of the joint rates, their primary divisions and the subdivisions to cover the haul east of the river. The Act does not require all questions concerning all divisions of such joint rates to be determined in one proceeding. *United States* v. *Abilene & So. Ry. Co., supra,* 282. *New England Divisions Case, supra,* 201. There was no defect of parties.

In their brief appellants suggest other grounds on which they claim the order should be annulled. But we think them plainly insufficient to warrant reversal and that, in view of what already has been shown in this opinion, they do not merit separate discussion.

The cross appeal was taken by the United States and the Interstate Commerce Commission; the other appellees, western trunk lines, did not join therein. The investigation was pending for more than five years before the first report was announced, December 10, 1928. No order was then made. The Commission allowed the carriers 60 days within which to agree on readjustments. In the report on rehearing, June 10, 1929, the Commission characterized the issues as important and the questions raised as relatively new and difficult. The order was made on the same day to take effect August 1, 1929. Before that date this suit was commenced, and the Commission postponed the taking effect of the order until December 1, 1929. In the meantime the case was tried and decided. It is clear that the Commission did not find that any emergency existed.

The decree dismissing the case was entered November 27, petition for appeal was filed that day and allowed November 30. Appellants applied for a stay. The time elapsing between the decree and the postponed effective date of the Commission's order was not sufficient to permit the giving of notice to appellees. The court found that novel and important questions concerning which there was serious doubt were presented by the assignment of errors; that if appellants, pending the appeal, paid the prescribed divisions and the order finally should be annulled they would be in danger of not being able to recover back the amounts in excess of existing divisions because of the financial condition of some of the western trunk line carriers; that as the prescribed divisions did not apply to all joint rates between the two territories, confusion and large useless expenditures would result if the order were enforced pending the appeal and the decree should be reversed; that the public interest would not suffer in any manner by reason of the stay and that the rights of the western trunk lines could be protected by bond. The stay was granted on appellants' giving a bond for $3,000,000 for the protection of the carriers to whom the order required payments of higher divisions.

Western trunk lines applied to have the stay vacated. After hearing and consideration of the showing and arguments made by the parties, the court reaffirmed its earlier findings and conclusions and further found that since the court's decision the interested carriers including appellants had worked diligently to establish the various percentages to be used in making the new divisions and that the work could not be completed for several months. After reviewing the situation the court said that the stay if continued in force would operate to save the carriers much labor and expense whether the appeal should be successful or not.

Undoubtedly the court had authority in its discretion, upon entry of the decree dismissing the bill, to stay the enforcement of the prescribed divisions pending appeal. *Virginian Ry.* v. *United States, supra,* 669. *Omaha & C. B. St. Ry. Co.* v. *Int. Com. Comm.,* 222 U. S. 582. *Cumberland Tel. Co.* v. *Pub. Serv. Comm.,* 260 U. S. 212, 219. *Cotting* v. *Kansas City Stockyards Co.,* 82 Fed. 850, 857. The court considered, and it cannot be said without reason, that the questions raised by the assignments of error are novel and doubtful. Unlike the situation presented in *Virginian Ry.* v. *United States, supra,* postponement of the taking effect of the order would inflict no loss upon the public—producers, shippers or consumers. It would not unfavorably affect the business of the carriers and, if the western trunk lines should ultimately be held entitled to the higher divisions, they could be protected by bond. We think it clear that the court did not abuse its discretion in granting the stay.

*The decrees are affirmed.*