See also, 106 F.Supp. 778.

**STATE OF MONTANA et al. v. UNITED STATES et al.**

No. 586.

United States District Court
D. Montana, Helena Division.

Aug. 13, 1952.

Arnold H. Olsen, Atty. Gen. of Montana, H. M. Brickett, Asst. Atty. Gen. of Montana, and Edwin S. Booth, Secretary-Counsel of the Board of Railroad Commissioners of Montana and Special Asst. Atty. Gen. of Montana, for plaintiff.

Lewis, Grant, Newton, Davis & Henry, Donald S. Graham, Denver, Colo., for American Crystal Sugar Co.

Martin & Holt, Edward A. Walsh, Denver, Colo., for Great Western Sugar Co.

Dennis O'Rourke, Lowe P. Siddons, Colorado Springs, Colo., for Holly Sugar Co.

Milton C. Gunn, Helena, Mont., for all sugar companies.

Edmond G. Toomey and Michael J. Hughes, Helena, Mont., for intervening plaintiffs Montana Stockgrowers Ass'n, Inc., and Montana Wool Growers Ass'n.

E. Riggs McConnell, Special Asst. to the Atty. Gen. for United States. Leo H. Pou, Asst. Chief Counsel, Interstate Commerce Commission, Washington, D. C., and Edward M. Reidy, Chief Counsel, Interstate Commerce Commission, Washington, D. C., James E. Kilday, Special Asst. to the Atty. Gen. and Dalton Pierson, U. S. Atty., Butte Mont., for defendants United States and Interstate Commerce Commission.

Marcellus L. Countryman, Jr., Conrad Olson, St. Paul, Minn. (Edwin C. Matthias, John C. Smith, Louis E. Torinus, Jr., St. Paul, Minn., Carson L. Taylor, Thomas H. Maguire, Chicago, Ill., Byron E. Lutterman, Seattle, Wash., Elmer B. Collins, Asst. Western General Counsel, Union Pacific Railroad, Omaha, Neb., Eldon M. Martin, Chicago, Ill.; and Robert D. Corette, Butte, Mont., and Newell Gough, Jr., Helena, Mont., of counsel), for intervening defendant Railroad Companies.

Before POPE, Circuit Judge, PRAY, Chief Judge, and MURRAY, District Judges.

PER CURIAM.

In an opinion filed July 24, 1952, D.C., 106 F.Supp. 778, we stated the issues involved in this proceeding and our conclusions upon some of them. We called attention to the fact that the court was unable to discover that the Interstate Commerce Commission, here called the Commission, had made in connection with its order here under review, or in its proceeding designated as Ex Parte 168, which preceded the Commission's order relating to Montana intrastate rates, a finding which we felt was an essential prerequisite to the validity of such order. The apparent omission there

referred to was the failure of the Commission to find the amount of revenue required from Montana intrastate traffic to enable the railroads operating in or through Montana to do so efficiently. Our reasons for considering such a finding essential and our inability to discover such finding were fully set forth in the former opinion and what was there said need not be repeated here.

Upon the further hearing then ordered counsel for the respective parties have been given an opportunity to discuss at length the questions which had troubled the court. Extensive briefs carefully prepared and able arguments on both sides have been of material assistance to the court and we now proceed, starting where we left off in the former opinion, to discuss our views with respect to the matters which were reserved for further argument.

Counsel for the defendant, the Commission, and the intervening Railroads, have undertaken to make several answers to our inquiry as to where the missing finding could be found. Counsel for the Commission conceded that they are unable to point to any explicit statement in the report in Ex Parte 168 reciting in effect that the additional revenues necessary to permit the railroads to operate efficiently was such that there would be required not merely the 8 per cent increase in interstate rates there ordered but also a like increase in intrastate rates.[1]

The first contention made is that the intention of the Commission to make such a statement or to include a determination that its interstate increase was fixed at the amount of 8 per cent upon the assumption that a like increase would be obtained on intrastate rates may be gathered from certain press notices and from the Commission's annual report to Congress issued subsequent to the Ex Parte 168 order. On the day following the issuance of the interim increase order in Ex Parte 168, the Com-

mission issued a notice to the public or press notice in which it said of the order and of the rate increase approved: "This estimate is based upon the assumption that corresponding increases will be made effective on intrastate traffic." A similar press notice was issued following a final order in that matter containing the statement: "These estimates assume corresponding increases in intrastate traffic." The final order in Ex Parte 168 was dated August 2, 1949. In its sixty-third annual report to Congress dated November 1 following, the Commission, with respect to the rate increases authorized in Ex Parte 168, said: "Based on the anticipated volume of traffic in 1949, our staff on December 29, 1948, estimated that the interim increases would yield a total of $425 millions additional revenue per annum to the class I railroads, provided corresponding increases were made effective simultaneously in instrastate traffic."

We think it is obvious that a finding wanting in the former report cannot be supplied from any such sources as those thus suggested. Aside from the wholly impracticable suggestion that interested parties might be required to wait from August 2, the date of the order, to November 1, the date of the annual report, to discover the essential finding, it is sufficient to say that under the provisions of Section 8(b) of the Administrative Procedure Act, 5 U.S.C.A. § 1007(b), all decisions of the Commission must "include a statement of (1) findings and conclusions, as well as the reasons or basis therefor, upon all the material issues of fact, law, or discretion presented on the record." We think it clear that the absent finding cannot be supplied by these press notices or the Commission's annual report.

Next it is argued that what we found missing both in the order here reviewed and in Ex Parte 168 is to be found in the Commission's findings in the earlier

1. The Commission says: "While we also are unable to point to any explicit statement to that effect in the report in Ex Parte 168, we would point out that there is also no language therein which would indicate that the Commission's findings were based upon a contrary assumption; that is, there is no finding or other statement to the effect that the requirements of the railroads would be met by the interstate increase only. We think that the Commission merely failed to state the obvious."

cases including Ex Parte 162 and 166. It is said that both the initial and the final report in Ex Parte 168 discloses that that proceeding was but a later phase of the readjustment of charges of the railroads incident to postwar economic changes. It is said therefore that the order in Ex Parte 168 must be read as though it had incorporated by reference certain findings and statements of the Commission in earlier orders which were explicit upon the point in respect to which the Ex Parte 168 order was silent.

The initial report in Ex Parte 168, (272 I.C.C. at page 698) stated: "This proceeding is a phase of the readjustment of the charges of rail carriers inevitably incident to the late World War and its economic aftermath. Accordingly, this report is to be read with our latest report (titled 'on further consideration') in Ex Parte No. 166, Increased Freight Rates, 1947, 270 I.C. C. 403, and with preceding reports in that proceeding, and also with the reports in the earlier proceeding of a similar character, Ex Parte No. 162, Increased Railway Rates, Fares and Charges, 1946, the latest being found at 266 I.C.C. 537, and also reports in other proceedings involving the whole or major portions of the railroad rate level, referred to in the two reports cited. The present proceeding may be considered in effect, if not in form, a part of the series * * *."

In the final report in Ex Parte 166, the Commission undertook to determine the reasonableness of the proposed increased rates for a constructive normal year and to estimate the traffic expected to move thereunder. In considering the revenue effects of rate increases authorized, the Commission said that the table of such increases "assumes increases to have been approved on intrastate traffic similarly to those upon interstate traffic in the same territory, for the whole time." The Commission also said in its report in Ex Parte 166: "This estimate is upon the assumption that timely similar adjustments will be made upon intrastate traffic." [2]

It is argued that an intention to include similar findings or statements in Ex Parte 168 is made manifest by the recital in the report in Ex Parte 168, that "We invited the cooperation of the State regulatory bodies as obviously State made rates would be involved." (272 I.C.C. at page 700.)

With respect to this argument that in effect the missing finding or statement was incorporated in Ex Parte 168 by the latter's reference to Ex Parte 166, we note that there is missing from the report in case No. 168 any general statement that everything said in Ex Parte 166 is now repeated in or intended to be a part of Ex Parte 168. Obviously the additional revenues called for by Ex Parte 168 are different in amount than those set forth in Ex Parte 166. The percentage of increase allowed is different. On the other hand, there were no doubt numerous reasons why the Commission in the opening sentence of its initial report in Ex Parte 168 should call attention to its earlier reports and should suggest that the later one be read with those which preceded it. There were numerous respects in which the latter proceeding could be said to deal with problems mentioned in the earlier ones.

It seems to us that we would have to put a very strained construction upon these references in the initial report in Ex Parte 168 in order to arrive at a conclusion that they operated to bring about a statement in Ex Parte 168 of that which is clearly missing therefrom. Such a construction would be a strained one wholly apart from the inferences to be drawn from the fact that the Commission apparently deliberately made the finding or statement in one case and omitted to make the same finding in another case.

2. The report also recited that its computations "presuppose that generally similar increases will be permitted by State authorities on intrastate traffic, or may become effective otherwise." It also said: "Considering the entire record upon this feature of the proceeding we conclude that the orders heretofore entered, especially when action by the State authorities is finally completed upon the carriers' proposals, meet the emergency needs of the petitioning carriers, as shown by the record * * *."

790

Our views as to the construction of the phraseology in the initial report in Ex Parte 168, which has here been urged upon us, cannot be better expressed than in the language of Mr. Justice Cardozo in U. S. v. Chicago, M., St. P. & P. R. Co., 294 U.S. 499, 510, 55 S.Ct. 462, 467, 79 L.Ed. 1023, as follows: "We would not be understood as saying that there do not lurk in this report phrases or sentences suggestive of a different meaning. One gains at places the impression that the Commission looked upon the proposed reduction as something more than a disruptive tendency; that it found unfairness in the old relation of parity between Brazil and Springfield; and that the new schedule in its judgment would confirm Milwaukee in the enjoyment of an undue proportion of the traffic. The difficulty is that it has not said so with the simplicity and clearness through which a halting impression ripens into reasonable certitude. In the end we are left to spell out, to argue, to choose between conflicting inferences. Something more precise is requisite in the quasi jurisdictional findings of an administrative agency."

The third argument made on behalf of the intervening Railroad defendants throws even further doubt upon the sufficiency of the Commission's findings. That argument in substance is that the finding which our former opinion declared missing was wholly unnecessary. It was contended that since the Commission in Ex Parte 168 and in the proceeding here under review found that the Railroads here affected required additional revenues at the time the application in Ex Parte 168 was presented, and since it found that the Montana intrastate rates are now on a lower level than the interstate rates now found reasonable, the fact that both kinds of traffic moved under the same conditions, with costs inextricably commingled, requires a conclusion that the intrastate rates may be properly ordered brought in line with the interstate rates. Counsel who made this contention on behalf of the Railroads summarized his argument as follows: "I think it is clear from what I have said earlier that in view

of the woefully inadequate revenues of the Montana lines, the low level of Montana intrastate rates, the fact that operating conditions are the same, that a contribution of no greater percent from Montana intrastate traffic than is currently being received from interstate traffic is not in excess of the amount needed by these lines to enable them to operate adequately and efficiently."

█ We find ourselves unable to go along with this argument. It appears to us to be an attempt to contend that the mere existence of a disparity between intrastate and interstate rates is sufficient to warrant the Commission to prescribe intrastate rates. We think it sufficiently settled that "the mere existence of a disparity between particular rates on intrastate and interstate traffic does not warrant the Commission in prescribing intrastate rates." Florida v. United States, 282 U.S. 194, 211–212, 51 S. Ct. 119, 124, 75 L.Ed. 291; North Carolina. v. United States, 325 U.S. 507, 516, 65 S.Ct. 1260, 89 L.Ed. 1760. We think that counsel is attempting to sustain the order by what the Supreme Court called in the North Carolina case "an over-simplified form of proof".

Here there is no finding as in Florida v. United States, 292 U.S. 1, 9, 54 S.Ct. 603, 607, 78 L.Ed. 1077, that the intrastate rate scale "was abnormally low and less than reasonably compensatory * * * 'insufficient under all the circumstances and conditions to cover the full cost of the service.'" There is nothing in the record before us to disclose a finding that the increased interstate rates and the existing intrastate rates are not both within a "zone of reasonableness".[3]

But the very fact that this argument thus rejected by us has been made here, suggests the possibility that the Commission accepted and acted upon a similar view. When that is considered there is brought to mind a special and peculiar reason why "a high standard of certainty" must be required of findings in a case of this character. For, as stated by Mr. Justice Cardozo in U. S. v. Chicago, M., St. P.

3. The term is from U. S. v. Chicago, M., St. P. & P. R. Co., supra, 294 U.S. at page 506, 55 S.Ct. 462, 465, 79 L.Ed. 1023.

& P. R. Co., supra, 294 U.S. at page 511, 55 S.Ct. 462, 467, 79 L.Ed. 1023. "We must know what a decision means before the duty becomes ours to say whether it is right or wrong." And as stated by Mr. Justice Douglas in U. S. v. Carolina Freight Carriers Corp., 315 U.S. 475, 489, 62 S.Ct. 722, 729, 86 L.Ed. 971, "An insistence upon the findings which Congress has made basic and essential to the Commission's action is no intrusion into the administrative domain." [4]

We remain of the opinion, previously expressed, that the essential finding mentioned is lacking in the Commission's report and order.

Finally, the defendants ask us to hold contrary to what was said in the former opinion that the order of the Commission must be sustained on the evidence and findings with respect to preference and prejudice as between persons and localities. In presenting this argument defendants rely upon Georgia Public Service Comm. v. United States, 283 U.S. 765, 774, 51 S.Ct. 619, 622, 75 L.Ed. 1397, in which the Supreme Court said, with respect to a similar proceeding: "When an investigation involves shipments from and to many places under varying conditions, typical instances justify general findings." [5]

It is contended that the Commission's findings of specific instances of preference and prejudice worked against interstate transportation and in favor of comparable intrastate hauls are sufficiently numerous and sufficiently typical to warrant the general, state-wide rate order here involved.

■ So far as the Georgia Comm. case, supra, is concerned, we think that it does not constitute authority for such a position here. The order in the Georgia Comm. case had to do with rates on but four related products, namely, chert, clay, sand and gravel. The indication by the Supreme Court that typical instances of preference and prejudice, with respect to these few products, would justify a general order with respect to such products does not suggest to us that we would be warranted in holding that the few instances of preference and prejudice listed in the present report and order, relating in the main to petroleum products, sugar beets, livestock,

---

4. The court there said, 315 U.S. at page 489, 62 S.Ct. at page 729, 86 L.Ed. 971: "Congress has also provided for judicial review as an additional assurance that its policies be executed. That review certainly entails an inquiry as to whether the Commission has employed those statutory standards. If that inquiry is halted at the threshold by reason of the fact that it is impossible to say whether or not those standards have been applied, then that review has indeed become a perfunctory process. If, as seems likely here, an erroneous statutory construction lies hidden in vague findings, then statutory rights will be whittled away. An insistence upon the findings which Congress has made basic and essential to the Commission's action is no intrusion into the administrative domain. It is no more and no less than an insistence upon the observance of those standards which Congress has made 'prerequisite to the operation of its statutory command.'"

5. The text quoted by defendants is as follows: "The appellants contend that the findings are unsupported by the evidence. When an investigation involves shipments from and to many places under varying conditions, typical instances justify general findings. Railroad Commission v. Chicago, B. & Q. R. Co., 257 U.S. 563, 579, 42 S.Ct. 232, 66 L.Ed. 371. Compare Beaumont, S. L. & W. Ry. Co. v. United States, 282 U.S. 74, 83, 51 S.Ct. 1, 75 L.Ed. 221. While the order relates only to a few commodities, the scales of rates are statewide in operation; and they apply to shipments between hundreds of points of origin and destination. To require specific evidence and separate adjudication in respect to each would be tantamount to denying the possibility of granting relief. Compare New England Divisions Case, 261 U.S. 184, 43 S.Ct. 270, 67 L.Ed. 605; Railroad Commission v. Chicago, B. & Q. R. Co., loc. cit. supra. The evidence was comprehensive in scope. It occupies 556 pages of the printed record; and there were besides 337 exhibits. The proof of the discrimination against interstate commerce was specific and typical, and was clearly sufficient to establish the undue prejudice to interstate shippers. Compare Nashville, C. & St. L. Ry. Co. v. Tennessee, 262 U.S. 318, 43 S.Ct. 583, 67 L.Ed. 999; United States v. Illinois Cent. R. Co., 263 U.S. 515, 44 S.Ct. 189, 68 L.Ed. 417."

792

cement, coal and ore and concentrates could be so typical of the shipments of manifold unrelated products as to constitute a basis for the order here in question. We can understand how the instances of preference and prejudice, in respect to shipments of petroleum products which are listed in the report, might well be so typical of all intrastate shipments of petroleum products that a general order increasing the rates on petroleum products might be sustained. That was the Georgia Comm. case. But we cannot perceive how findings of instances of preference and prejudice in the case of shipments of coal, petroleum products, cement and other items listed in the report could justify a general order relating to shipments of books, paper, household goods, harnesses, farm machinery, paints, lumber and a mass of other items not mentioned in the Commission's report.[6]

■ To support their argument that the instances of preference and prejudice here involved were not only typical but numerous and of major importance, counsel have asked us to examine Exhibit 3, which was introduced in evidence before the Commission. This Exhibit, it is said, enumerates item by item numerous products in respect to which definite losses are asserted to have resulted from the failure to obtain the intrastate increases demanded. We have been supplied with what purports to be a copy of that exhibit, showing the amounts of claimed losses set opposite each of these items, the total aggregating $535,-550.55, which would be a major portion of the $700,000 which the Commission found might have been procured by the Montana intrastate increases. It is sufficient to say that to arrive at any such figures we would

be obliged to delve into the record and go behind the Commission's findings. Under these circumstances "we are not called upon to examine the evidence in order to resolve opposing contentions as to what it shows or to spell out and state such conclusions of fact as it may permit. The Commission is the fact-finding body * * *." Florida v. United States, 282 U.S. 194, 215, 51 S. Ct. 119, 125, 75 L.Ed. 291.

■ We find also that many of the Commission's findings, with respect to preference and prejudice as between persons and localities, lack sufficient definiteness and specificity to be significant. Thus the Commission refers to a certain shipment of 970 pounds of mattresses and box springs from Spokane to Missoula on which the first-class rate of $2.03 was charged. It proceeds: "If a similar shipment *were made* from Billings to Helena, the rate would have been $1.54 * * *." (Emphasis added) Note that the similar shipment is purely hypothetical and the statement is in the subjunctive mode. Unless such shipments are found to have been made, there cannot be discriminatory prejudice. We think that a mere finding as to discrepancies in published rates without finding that shipments have been made in accordance with the differing rates are without significance. Numerous insufficient references of this kind are in the Commission's report. Thus the Commission compares rates on carloads of coal from Bearcreek, Montana, to Heron, Montana, a distance of 545 miles, with similar rates to Clark's Fork, Idaho, 559 miles. We are not advised as to how many carloads of coal were shipped under these rates to these points or whether any carload of coal was

6. In the argument considerable emphasis was placed upon the disparity between interstate and intrastate rates on sugar beets. Some Montana beet factories shipped a portion of their beets from other states, while others receive only intrastate shipments. In the case of each sugar mill, the farmer producers receive identical prices, whether the producer be within or without the State. It would appear that the main preference and prejudice, if any, operates against the sugar mill rather than the producer. But the owners of the sugar mills have

all intervened here in support of the State. It is urged that the portion of Section 13(4), 49 U.S.C.A. § 13(4), which authorizes the Commission to eliminate preference and prejudice as between persons and localities, is one enacted for the benefit of shippers and not the carriers, and that so far as the sugar beet industry is concerned the carriers are not in a position here to claim any advantage from the existence of any disparity in rates as to sugar beets. We find it unnecessary to express an opinion upon this point.

ever shipped from Bearcreek to either Heron or Clark's Fork. Findings are made as to disparity in rates on molasses shipped from a sugar mill at Chinook, Montana, to Billings on the one hand, and to Idaho Falls, Idaho, on the other. The Court probably may take judicial notice of the fact that the Chinook factory is now located in the State of Washington.

But in any event, wholly apart from the matters mentioned, we adhere to our former holding that the findings as to preference and prejudice as between persons and localities will not sustain the general order now before us.

It will be noted that notwithstanding what the Supreme Court said in the Georgia Comm. case, supra, in North Carolina v. United States, supra, 325 U.S. at page 513, 65 S.Ct. 1260, 89 L.Ed. 1760, the Supreme Court reaffirmed what it had said in Railroad Commission v. Chicago, B. & Q. R. Co., 257 U.S. 563, 42 S.Ct. 232, 234, 66 L.Ed. 371, to the effect that a general sweeping order against all intrastate rates may not be predicated upon findings of discrimination against particular localities and business groups made by the Commission under the clause about "persons" and "localities", which is a restatement of the doctrine of Houston, East & West Texas Ry. Co. v. U. S., 234 U.S. 342, 34 S.Ct. 833, 58 L.Ed. 1341. As stated in Railroad Commission v. Chicago, B. & Q. R. Co., supra: "In such a case, the saving clause by which exceptions are permitted cannot give the order validity."

For the reasons stated, both here and in our former opinion, we find that the order, the findings and the report of the Commission, now before us, lack the essential determination and finding of fact to which we have previously referred, and that such lack is not supplemented by any of the matters herein referred to. In short, we find that the Commission has made no finding as to what amount of revenue, if any, was required from intrastate traffic in Montana to enable the railroads here affected to operate efficiently. Accordingly, for the reasons and on the grounds stated, both in this and in our former opinion, both of which are hereby adopted as the find-

ings of this Court, we hold and conclude that the order here reviewed is not supported by the necessary findings of the Commission and that the same is void and in excess of the powers of the Commission. A permanent injunction will issue accordingly.