**CHICAGO AND NORTH WESTERN TRANSPORTATION COMPANY, Plaintiff and Counter-Defendant,**

v.

**The ATCHISON, TOPEKA AND SANTA FE RAILWAY COMPANY, Defendant and Counter-Plaintiff.**

**No. 73 C 1812.**

United States District Court,
N. D. Illinois, E. D.
Nov. 7, 1973.

Louis T. Duerinck, Christopher A. Mills, Chicago, Ill., for plaintiff and counter-defendant.

Harvey Huston, Harry L. DeLung, Jr., John C. Palmer, Jr., Chicago, Ill., for defendant and counter-plaintiff.

## MEMORANDUM OPINION AND ORDER

BAUER, District Judge.

This cause comes on the plaintiff's motion to dismiss the defendant's counterclaim.

This action is brought under the Interstate Commerce Act, 49 U.S.C., Part 1, Sections 1–26 inclusive, and the jurisdiction of this Court is allegedly based on 28 U.S.C. §§ 1331 and 1337. The matter in controversy exceeds the sum of ten thousand dollars exclusive of interest and costs.

Plaintiff, the Chicago and North Western Transportation Company ("North Western"), is a corporation or-

ganized under the laws of the State of Delaware with its principal place of business at Chicago, Illinois. North Western is engaged as a common carrier by rail for the carriage of goods in interstate commerce. North Western is the successor to substantially all of the transportation assets (and all rights, liabilities and obligations pertaining thereto) of Chicago and North Western Railway Company, a Wisconsin corporation.

The defendant, the Atchison, Topeka and Santa Fe Railway Company ("Santa Fe") is a corporation organized under the laws of the State of Delaware with its principal place of business in Chicago, Illinois. Santa Fe is engaged as a common carrier by rail for the carriage of goods in interstate commerce.

The plaintiff, in its complaint, alleges, *inter alia*, the following facts:

1. North Western maintains a perishable produce terminal within the City of Chicago, known as the Wood Street Terminal, at which North Western handles perishable produce shipments in switch service and not as a line haul carrier, receiving no portion of the through freight revenue applicable to such shipments.

2. Pursuant to applicable tariffs lawfully published and on file with the Interstate Commerce Commission, North Western as a switching carrier is required to perform on Santa Fe's behalf necessary re-icing services on refrigerator cars delivered to it by Santa Fe at Chicago, Illinois for switch movement at Wood Street Terminal.

3. North Western and Santa Fe are parties to National Perishable Freight Committee Division Sheet 7, which is a valid and binding agreement prescribing the basis of division of charges and expenses for furnishing refrigeration services to perishable shipments in freight cars moving over the lines of both North Western and Santa Fe. Pursuant to Item 30K, paragraphs (A)12 and (A)13 (Rules 224 and 225) and Item 40A, Exception 1 of said Division Sheet 7, North Western is entitled to recover from Santa Fe North Western's actual cost of performing re-icing services on refrigerators cars delivered to North Western from Santa Fe for switch movement at Wood Street Terminal.

4. During the period of June 7, 1965 to and including December 31, 1969, Santa Fe delivered 11,289 refrigerator cars to North Western at Chicago, Illinois for switch movement at Wood Street Terminal. All of said cars required re-icing by North Western on Santa Fe's behalf. By reason of services rendered in re-icing said cars, and pursuant to said National Perishable Freight Committee Division Sheet 7, Santa Fe became indebted to North Western in the amount of $259,064.54, which represents the actual cost to North Western of performing the re-icing services. By virtue of tariff charges for said re-icing services payable by the shipper or the receiver, as the case may be, North Western has been paid $150,168.62 leaving a balance due and owing from Santa Fe of $108,895.92 which represents the difference between said tarriff charges collected from shippers or receivers and the actual cost to North Western of performing said re-icing services. Although requested by North Western to pay such $108,895.92, the defendant has neglected to pay any part thereof.

On September 4, 1973 Santa Fe filed its answer to North Western's complaint and also a counterclaim to recover certain expenses allegedly incurred by Santa Fe in providing mechanical protective services to mechanical (as opposed to ice) refrigerator cars moving over North Western's lines. The counterclaim is based on several orders of the

Interstate Commerce Commission relating to the provisions of mechanical protective services in conjunction with a judgment of United States District Court for the Northern District of California.

Santa Fe, defendant and counter-plaintiff, in its counterclaim, alleges the following facts:

1. Pursuant to applicable tariffs lawfully published and on file with the Interstate Commerce Commission, counter-defendant and Santa Fe are required to transport perishable produce shipments, requiring refrigeration service, in interstate commerce. Such perishable produce shipments are transported in a large number of instances, over lines of either or both counter-defendant and Santa Fe, in mechanical refrigerator cars owned and furnished by Santa Fe. Refrigeration in these cars is provided by a mechanical unit which is attached to and located in the car. Ice is not needed to maintain a refrigerated condition in these cars.

2. Counter-defendant and Santa Fe are parties to National Perishable Freight Committee Division Sheet 7, which is an agreement establishing among other things, the basis for the division of charges and expenses for furnishing mechanical protective services, including refrigeration to perishable shipments moving over the lines of counter-defendant, Santa Fe, and other railroads. Under Division Sheet 7, as it is presently constituted and was constituted during all periods of time pertinent herein, the participating railroads pay eighty percent of the mechanical protective service charge published in the Perishable Protective Tariff, which is lawfully on file with the Interstate Commerce Commission, to the owner of the refrigerator car.

3. During all relevant periods of time this eighty percent payment was made to Santa Fe as the owner of such mechanical refrigerator cars with respect to all shipments transported in Santa Fe owned cars moving over the lines of the counter-defendant. The Interstate Commerce Commission, in its decision in Docket 35515, Contracts—Protective Service Between Pacific Fruit Express Company and the Akron, Canton and Youngstown Railroad Company, et al., 340 I.C.C. 754, interpreted its order published at 49 C.F.R. §§ 1032.1 and 1032.2 to require a party furnishing and operating mechanical refrigerator cars for use in protecting perishable shipments moving over lines of railroads should recover its costs from those railroads so utilizing that car. At all times pertinent herein Santa Fe furnished large numbers of refrigerator cars which were used in protecting shipments of perishable produce moving over the lines of counter-defendant.

4. Notwithstanding the payments received by Santa Fe as a car owner pursuant to Division Sheet 7, Santa Fe, at all times pertinent, has been unable to recover its costs in furnishing protective services to various railroads, including counter-defendant. For the years 1970, 1971 and 1972 the deficit incurred by Santa Fe as a supplier of mechanical refrigerator cars in furnishing such protective service for cars on the lines of counter-defendant amounted to $214,699.65. Santa Fe has submitted to counter-defendant bills totally the amount listed above, but counter-defendant has failed and refused to pay to Santa Fe the sums of money owed [as allegedly determined by the court in Pacific Fruit Express Company v. Akron, Canton & Youngstown Railroad Company, et al., 355 F.Supp. 700

(N.D.Cal.1973), suit to which both Santa Fe and North Western were parties].

The plaintiff, in support of its motion to dismiss the counterclaim contends that:

1. This Court has neither federal question nor diversity of citizenship jurisdiction over the counterclaim.

2. This Court is without jurisdiction to enforce the orders of the Interstate Commerce Commission referred to in paragraph 8 of the counterclaim.

3. The Interstate Commerce Commission has exclusive jurisdiction over the subject matter of the counterclaim which is a readjustment in the division of revenues among joint rail carriers.

The Santa Fe, defendant and counter-plaintiff, in opposition to the instant motion, contends that:

1. This Court has jurisdiction to hear the counterclaim as a federal question or as a counterclaim which is ancillary to the complaint.

2. This Court has jurisdiction to consider the issue of North Western's liability to Santa Fe for its costs of providing protective service to North Western.

It is the opinion of this Court that the motion of the plaintiff, counter-defendant to dismiss the counterclaim has merit.

## I. THE COUNTER–PLAINTIFF HAS FAILED TO PROPERLY ALLEGE FEDERAL JURISDICTION.

■■■ It is well established that a compulsory counterclaim under Rule 13(a) of the Federal Rules of Civil Procedure is within the ancillary jurisdiction of a federal court since it necessarily arises out of the same transaction or occurrence as the original claim.[1] A permissive counterclaim under Rule 13(b) requires an independent ground of federal jurisdiction since it does not arise out of the same transaction or occurrence as the original claim except where a set off is involved. Moore v. New York Cotton Exchange, 270 U.S. 593, 46 S.Ct. 367, 70 L.Ed. 750 (1926); Revere Copper & Brass Inc., v. Aetna Casualty and Surety Co., 426 F.2d 709 (1970); Camper & Nicholsons Ltd. v. Yacht "Fontainebleau II", 292 F.Supp. 734 (S.D.Fla.1968); Fraser v. Astra Steamship Corp., 18 F.R.D. 240 (S.D.N. Y.1955). For the application of ancillary jurisdiction, a counterclaim must appear to have a logical relationship to the original claim in that it arises out of the same aggregate of operative facts as the original claim in two senses: (1) that the same aggregate of operative facts serves as the basis of both claims; (2) that the aggregate core of facts upon which the original claim rests activates additional legal rights in a party defendant that would otherwise remain dormant. Revere Copper & Brass Inc. v. Aetna Casualty and Surety Co., *supra.*

The counterclaim seeking money damages on the basis of alleged violations of

1. The concept of ancillary jurisdiction is not a recent invention, but has been part of our law for at least a century or more. See, e. g., Freeman v. Howe, 24 How. 450, 65 U.S. 450, 16 L.Ed. 749 (1861). The Supreme Court set down what it termed the "general rule" in Fulton National Bank of Atlanta v. Hozier, 267 U.S. 276, 45 S.Ct. 261, 69 L.Ed. 609 (1925). In that case the Supreme Court articulated the "general rule" as follows: "that when a federal court has properly acquired jurisdiction over a cause, it may entertain, by intervention, dependent or ancillary controversies; but no controversy can be regarded as dependent or ancillary unless it has a direct relation to property or assets actually or constructively drawn into the court's possession or control by the principal suit." Many early decisions seem to go beyond this limited concept of ancillarity. See generally, note, "The Ancillary Concept and the Federal Rules", 64 Harv.L. Rev. 968 (1951).

Interstate Commerce Commission regulations and quantum meruit does not bear a "logical relationship" to the complaint which is for enforcement for an executory agreement between the parties. The counterclaim involves the alleged provision by Santa Fe of mechanical refrigeration services to mechanical refrigerator cars moving in line-haul service on the lines of North Western during the years 1970, 1971 and 1972. The complaint involves the provision by North Western (pursuant to contractual terms not in issue in the counterclaim) of icing services to ice refrigerator cars moving in switching service within one terminal during the years 1965 through 1969. Thus, the claims are of an entirely different nature and involve different shipments moving in different service in different types of equipment at different times.

■ The counterclaim is therefore permissive rather than compulsory under Federal Rule of Civil Procedure 13(a). Since the counterclaim is not a compulsory one, jurisdiction over it does not attach from the jurisdictional allegations of the complaint under Federal Rule of Civil Procedure 8(a).

■ The counterclaim contains no specific jurisdictional allegation as required by Rule 8(a) of the Federal Rules of Civil Procedure, but merely realleges paragraphs 2 and 3 of the complaint and answer. These paragraphs allege that both North Western and Santa Fe are Delaware corporations with their principal places of business at Chicago, Illinois, and thus show on their face that the Court is without diversity of citizenship jurisdiction under 28 U.S. C. § 1332. The counterclaim therefore is defective and should be dismissed for want of subject matter jurisdiction.

## II. IT IS DOUBTFUL THAT THIS COURT HAS PRIMARY AND EXCLUSIVE JURISDICTION OVER THE SUBJECT MATTER OF THE COUNTERCLAIM.

Notwithstanding the fact that the defendant and counter-plaintiff has fatally failed to properly allege federal jurisdiction over the counterclaim, it is doubtful that this Court has jurisdiction at this time over the subject matter of the counterclaim.

The counterclaim is an action to enforce two orders of the Interstate Commerce Commission, one entered on August 27, 1962, in its docket Ex Parte No. 137, published at 49 C.F.R. §§ 1032.1 and 1032.2, and the other entered on February 28, 1972, in its docket 35515, published at 340 ICC 754.

The 1962 ICC order in Ex Parte No. 137 prescribed certain terms to be included in mechanical protective service contracts between railroads and refrigerator car-line companies and required such contract to be filed with and approved by the ICC. The 1972 ICC report and order in Docket 35515, Contracts-Pacific Fruit Express Co. and Akron, C & Y R. Co., 340 ICC 754 (1972), was rendered pursuant to a referral of several questions to the ICC by the United States District Court for the Northern District of California (see Pacific Fruit Express Co. v. Akron, Canton & Youngstown R. Co., 355 F.Supp. 700 (N.D.Cal.1973). The opinion in Docket 35515 was merely an advisory one, conferring, *per se,* no substantive rights in the instant action.[2] The ICC therein specifically ruled that its 1962 order in Ex Parte No. 137 itself does not constitute a contract and "does not confer substantive rights upon the protective service companies [or rail carriers] to recover losses."

In its counterclaim Santa Fe alleges that it supplies protective services for

---

**2.** The ICC's 1972 order in Docket 35515 was never published in the Federal Register; 5 U.S.C. § 552(a)(1) requires such publication if an agency order of general applicability is to be enforceable.

mechanical refrigerator cars while moving in line-haul service over the North Western, that Santa Fe incurs deficits in supplying such services, and that North Western's payments to Santa Fe should be increased retroactively to make up the deficits. Thus, what Santa Fe is seeking in essence is an increase in its division of the total line-haul revenue applicable to through shipments in mechanical refrigerator cars moving jointly over the Santa Fe and the North Western.

■ This Court is without jurisdiction to entertain an action seeking a readjustment in the division of revenues among joint carriers because Congress in Section 15(6) of the Interstate Commerce Act, 49 U.S.C. § 15(6), has vested the Interstate Commerce Commission with primary and exclusive jurisdiction over such readjustments. Section 15(6) provides in pertinent part:

> Whenever, after full hearing upon complaint or upon its own initiative, the Commission is of the opinion that the divisions of joint rates, fares, or charges, applicable to the transportation of passengers or property, are or will be unjust, unreasonable, inequitable, or unduly preferential or prejudicial as between the carriers parties thereto (whether agreed upon by such carriers, or any of them, or otherwise established), the Commission shall by order prescribe the just, reasonable and equitable divisions thereof to be received by the several carriers, and in cases where the joint rate, fare, or charge was established pursuant to a finding or order of the Commission and the divisions thereof are found by it to have been unjust, unreasonable or inequitable, or unduly preferential or prejudicial, the Commission may also by order determine what (for the period subsequent to the filing of the complaint or petition or the making of the order of investigation) would have been the just, reasonable, and equita-

ble adjustment to be made in accordance therewith.

■ Courts on numerous occasions have interpreted Section 15(6) to mean that the Interstate Commerce Commission has exclusive jurisdiction to determine what is a proper division of joint rates between joint carriers. See, e. g., Bachus-Brooks Co. v. Northern Pacific Railroad Co., 21 F.2d 4 (8th Cir. 1927), cert. denied 275 U.S. 562, 48 S.Ct. 120, 72 L.Ed. 427; Beaumont, S. L. & W. Railway Co. v. United States, 36 F.2d 789 (8th Cir. 1929), aff'd, 282 U.S. 74, 51 S.Ct. 1, 75 L.Ed. 221; Atlantic Coast Line R. Co. v. Delaware & H. R. Corp., 86 F.2d 721 (2nd Cir. 1936). Under these decisions the subject matter of Santa Fe's counterclaim must first be brought before the ICC before court review is obtainable.

Liability under Sections 8 and 9 of the Interstate Commerce Act can only arise if North Western has violated Section 1(14)(b) of the Act, 49 U.S.C. § 1(14)(b), which provides, in pertinent part, that:

> (b) It shall be unlawful for any common carrier by railroad or express company, subject to this chapter, to make or enter into any contract, agreement, or arrangement with any *person* for the furnishing to or on behalf of such carrier or express company of protective service against heat or cold to property transported or to be transported in interstate or foreign commerce, or for any such carrier or express company to continue after April 1, 1941, as a party to any contract, agreement, or arrangement unless and until such contract, agreement, or arrangement has been submitted to and approved by the Commission as just, reasonable, and consistent with the public interest. (Emphasis added).

■■ The word "person" in Section 1(14)(b) does not include common carriers;[3] this means that ICC approval

---

3. Congress has been very careful throughout the Interstate Commerce Act to specify "common carrier" rather than simply "person" when it intended to refer to carriers.

need not be obtained of protective service arrangements between common carriers and a shipper or car line company. Therefore, failure to obtain approval of the basic agreement involved in the counterclaim (Division Sheet 7 which is an agreement strictly among common carriers) has not resulted in any violation of Section 1(14)(b).

The ICC alone has primary and exclusive jurisdiction over readjustments in the division of joint revenues and expenses from joint through movements. The counterclaim must be dismissed.

Accordingly, it is hereby ordered that the plaintiff's motion to dismiss the counterclaim is granted and the counterclaim is dismissed without prejudice.

Further, Congress has carefully provided different definitions of "common carrier" and "person" in Section 1(3)(a) of the act, 49 U.S.C. § 1(3)(a).

The decision of the California Court in Pacific Fruit Express Co. v. Akron, C & Y Railroad Co., 355 F.Supp. 700 (N.D.Cal.1973), cited by Sante Fe, does not imply a contrary interpretation of Section 1(14)(b) because that case involved a dispute between railroads and a car-line company which is not a common carrier.