## DAVIDSON TRANSFER & STORAGE CO. et al. v. UNITED STATES et al.

### No. 1746.

District Court, E. D. Pennsylvania.

Dec. 12, 1941.

As Amended Jan. 8, 1942.

216

Charles E. Cotterill, of New York City, and Richard V. Zug, of Philadelphia, Pa., for plaintiffs.

Edward A. Kallick, Asst. U. S. Atty., and Gerald A. Gleeson, U. S. Atty., both of Philadelphia, Pa., and Robert L. Pierce, Sp. Atty., Dept. of Justice, of Washington, D. C., for the United States.

E. M. Reidy, Asst. Chief Counsel, and Daniel W. Knowlton, Chief Counsel, both of Washington, D. C., for the Commission.

Meyer Love, of Philadelphia, Pa., for Schultz.

Before BIGGS, Circuit Judge, and BARD and GANEY, District Judges.

BIGGS, Circuit Judge.

The plaintiffs, The Davidson Transfer & Storage Co. and W. T. Cowan, Inc., are common carriers by motor vehicle of commodities including fresh meats, packing house products and fresh frozen foods between Washington, D. C., and New York City, and between intermediate cities such as Baltimore, Wilmington, Philadelphia and Trenton over regular routes, and comprise two of more than twenty carriers operating between the cities referred to and carrying the commodities enumerated.

The defendant, Schultz Refrigerated Service, Inc., filed an application with the Interstate Commerce Commission pursuant to the provisions of Sections 206, 207 and 208 of the Motor Carrier Act of 1935, 49 U.S.C.A. §§ 306, 307 and 308, for a certificate of public convenience and necessity to operate by motor vehicle in interstate commerce as a common carrier of (1) fresh meats and packing house products and the return of empty containers in both directions between Washington and Baltimore on the one hand and Trenton, New York, Camden and Philadelphia, and points within 40 miles of Philadelphia on the other, and of (2) various frozen foods and the return of empty containers between New York City, Philadelphia and Trenton, New Jersey, on the one hand, and places within 250 miles of each of them on the other.[1] The Commission granted a certificate of public convenience and necessity authorizing Schultz to operate as a common carrier by motor vehicle in interstate commerce to haul the commodities substantially as above specified over the designated routes. The plaintiffs seek to have those portions of the order [2] of the Commission

---

[1] Permission was also sought to operate as a common carrier of frozen foods and empty containers between Bridgeton, N. J., and points within 40 miles thereof on the one hand, and points within 150 miles thereof in all directions on the other; and between Dover, Delaware on the one hand and points within 200 miles thereof on the other.

No question is raised, however, in the present proceedings as to operations between these points.

[2] The material portions of the order are as follows:

"It is ordered, that the said carrier be, and it is hereby, granted this Certificate of Public Convenience and Necessity as evidence of the authority of the holder to engage in transportation in interstate or

authorizing this transportation annulled and set aside and to have Schultz enjoined from conducting it.

█ The plaintiffs chose not to introduce into evidence in this court the Testimony upon which the Commission's order was based. Under these circumstances we are bound to conclude that the findings of the Commission are based upon adequate evidence. Mississippi Valley Barge Line Co. v. United States, 292 U.S. 282, 286, 287, 54 S.Ct. 692, 78 L.Ed. 1260. The plaintiffs contend that the Commission in its opinion did not set forth with sufficient clarity, or at all, the basic findings upon which its ultimate finding that public convenience and necessity required the issuance of the certificate to Schultz was based, and that therefore the Commission's order, to the extent that it authorizes Schultz to transport the commodities set forth under (1) and (2) supra upon the routes indicated, must be annulled and set aside.

The Commission handed down two reports and made two orders. The second order set aside the first order and granted the certificate. The Commission in its first report (No. MC—21576, Sub. No. 2), decided August 22, 1940, refused the certificate, and granted it in its second report (at the same number as that above), decided January 17, 1941.

In its first report the Commission sets forth the testimony of numerous witnesses. One witness, described as engaged in the meat brokerage business in Philadelphia, dealing in fresh meats in Philadelphia and its suburbs, testified that his business decreased from 60,000 and 100,000 pounds per week to about 20,000 pounds per week because of the unsatisfactory service which he received from carriers now operating between Baltimore and Philadelphia. He testified also that shipments were sometimes refused because of the condition of the meats and that some of the larger carriers serving his territory had refused to transport his commodities, giving no reason, however, for such refusal. Another witness, engaged in the packing of frozen fruits and vegetables, testified that two of the larger carriers have refused to transport his shipments, the Commission's report however not stating to what places these carriers refused transport. This same witness testified that a shipment of frozen pumpkin to Washington was spoiled when it was delivered because of delay.

The report goes on to say: "A number of the shippers testified that the motor carriers now operating between points in part of the territory under consideration had refused to transport their less-truck load shipments." The Commission then states: "The principal controversy between shippers and carriers concerns the question as to which party should furnish the dry ice on less-truck load shipments * * *. The record shows that protestant carriers' equipment is not being utilized to its full capacity and the evidence is convincing that the real basis for the shippers' contention that additional service is required between the points served by protestants, is the controversy between presently authorized carriers and shippers as to who should furnish the ice on less-than-truckload shipments."

In its second report of January 17, 1941, the Commission changes its conclusions on reconsideration of the case and finds that public convenience and necessity require the operations described and authorized in its final order. In its first report it had found that the cause of the controversy was the question as to who should furnish icing. In its second report it substituted for the

---

foreign commerce as a common carrier by motor vehicle; subject, however, to such terms, conditions, and limitations as are now, or may hereafter be, attached to the exercise of the privileges herein granted to the said carrier.

"It is further ordered, that the transportation service to be performed by the said carrier in interstate or foreign commerce shall be as specified below:

"*Fresh frozen fruits and vegetables, fresh and frozen fish, ice cream and materials* used in the manufacture of ice cream, *fruit peel,* and *empty containers* for the above commodities, over irregular routes.

* * *

"Between Philadelphia, Pa., Trenton, N. J., and New York, on the one hand, and, on the other, the District of Columbia and points and places in New Jersey, Pennsylvania, Delaware, Maryland, and New York, within 250 miles of Philadelphia, Trenton, and New York, respectively.

* * *

"*Packing-house products* and *empty containers* therefor, over irregular routes,

"Between Wilmington, Del., Philadelphia, Pa., and points and places in Pennsylvania and New Jersey within ten miles of Philadelphia, on the one hand, and, on the other, Baltimore, Md., and the District of Columbia."

ultimate finding that no additional service was needed an ultimate finding that irrespective of any controversy with respect to furnishing ice, additional service was needed. The Commission stated in this connection:

"A further review of the evidence, however, establishes that shippers have been unable to obtain proper and sufficient service, particularly on less-than-truckload shipments, on commodities requiring refrigeration, between Philadelphia, Wilmington, Baltimore, and Washington. Although protestant motor carriers contend that an agreement between the shippers and existing motor carriers as to the furnishing of ice will eliminate present difficulties as to service, the record does not support this view. It is noted, for example, that these carriers provide ice on truckload shipments of fresh frozen fruits and vegetables, but not on lesser quantities, and on any-quantity lots of packing-house products. They also give expeditious service on truck-load shipments, but have, on occasions, either rejected small shipments on the ground that such a service is not profitable to them or have delayed providing equipment on small lots. In other instances foods requiring protection from outside temperatures have been transported in non-refrigerated units with a resultant spoilage and loss to the shippers. That additional service, rather than an agreement as to charges, is necessary is further indicated by the fact that at least two of the shippers who have been unable to obtain service on less-than-truckload shipments testified to their willingness either to furnish ice themselves or to pay additional charges to carriers for providing such protection.

"Protestant motor carriers serve a substantial number of large shippers of foods requiring temperature control between Washington and New York City and the limited number of refrigeration units operated by them are in active service. As a matter of fact, four additional units are being built by them to take care of their existing accounts. Other shippers desiring service on small lots between Philadelphia and Washington have been accommodated only when these carriers lack full loads from shippers regularly served by them. Such occasional service has not been sufficient to satisfy the needs of shippers at Philadelphia. The grant of operating authority herein will not deprive existing carriers of an appreciable amount of traffic since applicant will supply a service not presently available."

The Commission arrived at a different conclusion upon a reconsideration of the evidence, but in so doing, it did neither more nor less than many a court and many a judge has done upon the rehearing of a case.

■ The plaintiffs' contention that the Commission did not make the necessary basic findings of fact to support its ultimate conclusion of fact is stated by them as follows: "The validity of the Commission's order is here assailed on its face, in the light of the findings not made and the purported findings which were made." The question which we must decide is whether the ultimate conclusion of fact reached by the Commission is supported by the basic findings set forth in the Commission's second report. The Commission has found and stated basic findings of fact which should and do lead to its ultimate conclusion of fact. This is sufficient under the authorities.[3] See United States v. Baltimore

---

[3] As to the processes to be employed by the Commission in arriving at its basic findings and its ultimate finding Judge Stephens, in his illuminating opinion in Saginaw Broadcasting Co. v. Federal Communications Commission, 68 App.D.C. 282, 96 F.2d 554, 559, 560, states:

"In discussing the necessary content of findings of fact, it will be helpful to spell out the process which a commission properly follows in reaching a decision. The process necessarily includes at least four parts: (1) evidence must be taken and weighed, both as to its accuracy and credibility; (2) from attentive consideration of this evidence a determination of facts of a basic or underlying nature must be reached; (3) from these basic facts the ultimate facts, usually in the language of the statute, are to be inferred, or not, as the case may be; (4) from this finding the decision will follow by the application of the statutory criterion. For example, before the Communications Commission may grant a construction permit it must, under the statute, be convinced that the public interest, convenience, or necessity will be served. An affirmative or negative finding on this topic would be a finding of ultimate fact. This ultimate fact, however, will be reached by inference from basic facts, such as, for example, the probable existence or non-existence of electrical interference, in view of the number of other stations operating in the area, their power, wave length, and the

& O. R. Co., 293 U.S. 454, 464, 465, 55 S.Ct. 268, 79 L.Ed. 587, and compare Florida v. United States, 282 U.S. 194, 215, 51 S.Ct. 119, 75 L.Ed. 291. The facts stated by the Commission in its second report, and regarded by it as sufficient to invalidate its former view that the controversy over furnishing ice underlay the complaint as to inadequate service, constitute together with other facts stated in the second report the basic findings which call forth the ultimate conclusion of the Commission. In the Baltimore & O. Railway case [293 U.S. 454, 55 S.Ct. 273, 79 L.Ed. 587], Mr. Justice Brandeis used the following language which is illuminating in this connection: "In the Florida Case [Florida v. United States, supra] the legal distinction was pointed out between what may be termed quasi jurisdictional findings, there held to be indispensable, and the 'complete statement of the grounds of the Commission's determination' which was declared in Beaumont, S. L. & W. Ry. Co. v. United States, 282 U.S. 74, 86, 51 S.Ct. 1, 75 L.Ed. 221, to be desirable for a proper consideration of the case in the courts. The lack of such a complete statement, while always regrettable, because unnecessarily increasing the labor of the reviewing court (compare Virginian Ry. Co. v. United States, 272 U.S. 658, 675, 47 S.Ct. 222, 71 L.Ed. 463), is not fatal to the validity of the order."

The report of the Commission might be regarded as subject to some criticism in that it fails to state clearly the complete reasons for the conclusion and thus fails to present a "complete statement of the grounds of the Commission's determination", but it cannot be set aside as lacking in a statement of the basic findings which underlie its ultimate determination.

We can see no merit in the contention that if additional service is required the Commission must impose the duty of supplying such additional service upon existing carriers pursuant to the provisions of Sections 204, 206, 207 and 208 of the Motor Carrier Act of 1935 (see 49 U.S. C.A. §§ 304, 306, 307 and 308). The plaintiffs point to the provisions of § 308(a) [4] and take the position that the words of the statute compel the Commission to create additional service only by increasing the operations of existing carriers. We confess that the theory that the Commission could, by executive fiat, compel an existing carrier to double or treble its service under penalty of the revocation of an existing certificate of convenience and necessity, seems to us to be inconsonant with the principles of the Fifth Amendment. We think that the Commission does not possess such power, but that it may compel a carrier to give to the public the service contemplated by the certificate of convenience and necessity issued to such carrier. In the case at bar the Commission has found that the services of an additional carrier are required over the routes designated in order that the public may have adequate service. It made no finding that any of the protestant carriers were derelict in their duties, but even if the Commission had made such a finding, we would not conclude that the Commission was thereby prohibited from authorizing an additional, and, if need be, a competing carrier to operate in the field. We think that one of the weapons in the Commission's arsenal is the right to authorize competition where it is necessary in order to compel adequate service and there is nothing in any of the sections cited or in their legislative history that would re-

---

like. These basic facts will themselves appear or fail to appear, as the case may be, from the evidence introduced when attentively considered.

\* \* \*

"We now rule that findings of fact, to be sufficient to support an order, must include what have been above described as the basic facts, from which the ultimate facts in the terms of the statutory criterion are inferred. It is not necessary for the Commission to recite the evidence, and it is not necessary that it set out its findings in the formal style and manner customary in trial courts. It is enough if the findings be unambiguously stated, whether in narrative or numbered form, so that it appears definitely upon what basic facts the Com-

mission reached the ultimate facts and came to its decision."

[4] These state inter alia, "Any certificate issued under section 306 or 307 shall specify the service to be rendered \* \* \*; and there shall, at the time of issuance and from time to time thereafter, be attached to the exercise of the privileges granted by the certificate such reasonable terms, conditions, and limitations as the public convenience and necessity may from time to time require, including \* \* \* such terms and conditions as are necessary to carry out, with respect to the operations of the carrier, the requirements established by the Commission under section 304(a) (1) \* \* \*."

quire a contrary conclusion. The conception that the public must wait while the Commission exercises its statutory powers fortified by orders of court, to compel existing carriers to do what they should do, is one which does not commend itself to common sense and the public interest.

The complaint will be dismissed.