**FROZEN FOOD EXPRESS, INC.,** Midwest Emery Freight System, Inc., and Little Audrey Transportation Co., Inc., and Midwest Coast Transport, Inc., (as per order 9–3–68)

v.

**UNITED STATES of America** and Interstate Commerce Commission and J. B. Montgomery, Inc., and Dart Transit Company, Intervening Defendants; and Curtis, Inc. and Denver-Albuquerque Motor Transport, Inc., Intervening Defendants; and Cornland Dressed Beef Company and Minden Beef Company.

Civ. A. No. 3–2137.

United States District Court
N. D. Texas,
Dallas Division.

June 16, 1969.

Phinney, Hallman, Pulley & Livingstone, by Wm. E. Livingstone, III, Dallas, Tex., for Frozen Food Express, Inc.

Axelrod, Goodman & Steiner, Leonard Kofkin, Chicago, Ill., for plaintiffs, Midwest Emery Freight and Little Audrey Transp. Co., Inc.

Stern, Harris, Feldman & Becker, by Donald L. Stern, Omaha, Neb., Phinney, Hallman, Pulley & Livingstone, by Ralph W. Pulley, Dallas, Tex., for intervening plaintiff, Midwest Coast Transport, Inc., a corp.

Donald F. Turner, Asst. Atty. Gen., Eldon B. Mahon, U. S. Atty., John H. D. Wigger, Atty., Dept. of Justice, Washington, D. C., Seymour Dussman, Anti-Trust Division, Dept. of Justice, Washington, D. C., for defendant, United States.

Robert W. Ginnane, Gen. Counsel, Nahum Litt, Atty., Washington, D. C., for defendant, Interstate Commerce Commission.

James C. Hardman, Singer & Hardman, Chicago, Ill., Hightower & Phillips, by Herbert H. Phillips, Dallas, Tex., for defendants (intervening) J. B. Montgomery, Inc. and Dart Transit Company.

Acklie & Peterson, by Richard A. Peterson, Lincoln, Neb., for defendants (intervening) Curtis, Inc. and Denver-Albuquerque Motor Transport, Inc., Hirschbach Motor Lines, Inc., Romans Motor Freight, Inc., and Cornland Dressed Beef Co. and Minden Beef Company.

Before THORNBERRY, Circuit Judge, ESTES, Chief Judge, and TAYLOR, District Judge.

WILLIAM M. TAYLOR, Jr., District Judge.

This action is brought to review, enjoin, set aside, annul and suspend, in whole or in part, the decision and order of the Interstate Commerce Commission, Division 1, acting as an appellate divi-

sion, to the extent it grants applications of the following:

(1) Watkins Motor Lines, Inc., MC 95540 (Sub 644);

(2) Curtis, Inc., MC 113678 (Sub 140);

(3) J. B. Montgomery, Inc., MC 123639 (Sub 28);

(4) Caravelle Express, Inc., MC 124774 (Sub 20);

(5) Romans Motor Freight, Inc., MC 68539 (Sub 14);

(6) Albuquerque Motor Transport, MC 107839 (Sub 81);

(7) W. J. Digby, Inc., MC 115826 (Sub 37);

(8) W. J. Digby, Inc., MC 115826 (Sub 42);

(9) Hirschbach Motor Lines, Inc., MC 117686 (Sub 57);

(10) Bos Lines, Inc., MC 21170 (Sub 67);

(11) Bos Lines, Inc., MC 21170 (Sub 68);

(12) Dart Transit Company, MC 114457 (Sub 35).

The order is dated December 19, 1966 and was served on the parties January 17, 1967. The order affirmed the decision and order of the Commission, Division 1, served July 15, 1966.

All plaintiffs are motor vehicle common carriers engaged in interstate commerce in the transportation of commodities pursuant to authority granted them by the Interstate Commerce Commission. Each engages extensively in the transportation of various authorized commodities in both direct or single and joint or interline service within the areas proposed to be served by the applicants listed above. Cornland Dressed Beef Company was the supporting shipper.

By applications filed in late 1964 and 1965 various common carriers by motor vehicle sought certificates of public convenience and necessity authorizing transportation of meats, meat products, meat byproducts, and articles distributed by meat packinghouses from points in Nebraska to points in other specified states. The applications were referred to an examiner for consolidated hearing. Certain of the applications which were unopposed were the subject of a separate report, and others were withdrawn. On October 6, 1965, the examiner issued a report recommending denial of the remaining applications. Exceptions were filed with respect to twenty-two of these applications and, on June 27, 1966, Division 1 of the Commission issued a report granting twelve of the applications and denying the remainder. Upon petitions for reconsideration, Division 1, acting as an Appellate Division, issued an order, served January 17, 1967, approving the prior decision. Following this order, certificates of public convenience and necessity were granted to the successful applicants and motor carrier operations have been conducted pursuant to those certificates. The dispute before this Court is whether the Commission applied appropriate standards in determining the public convenience and necessity and whether there is substantial evidence of record to support the Commission's findings.

Plaintiffs contend that the ICC was arbitrary in reversing the hearing examiner. They argue that the Commission is bound by the examiner's report and the two decisions are incompatible. The court cannot accept this proposition.

The Commission is not bound by the examiner's conclusions. 5 U.S.C.A. § 557. Rather the Commission is free to make its own independent determinations. Braswell Motor Freight Lines, Inc. v. United States, 275 F.Supp. 98 (W.D.Tex.1967), aff'd per curiam 389 U.S. 569, 88 S.Ct. 692, 19 L.Ed.2d 779. In the case at bar, the examiner found that all of the shipper's needs as of the hearing date were being met and that all available service was not being utilized. When he applied these facts to the law, he recommended denial of the applica-

tions.[1] The Commission, while agreeing with his findings, considered the future needs of the shipper, Cornland Dressed Beef Company, especially since Minden Beef Company, Cornland's affiliate, was to commence operation and function at an approximately equal level to that of Cornland. Another factor was the anticipated opening of additional market areas. These unchallenged facts are stated in Caravelle Express, Inc., Extension—Lexington and Minden, Nebr., 102 M.C.C. 311 (1966). Based on these and other considerations of future need and within its discretion to determine public convenience and necessity, the Commission decided to grant the applications. 49 U.S.C.A. § 307(a); Interstate Commerce Commission v. Parker, 326 U.S. 60, 70, 65 S.Ct. 1490, 1495, 89 L.Ed. 2051 (1944);[2] United States v. Dixie Highway Express, Inc., et al., 389 U.S. 409, 88 S.Ct. 539, 19 L.Ed.2d 639 (1967);[3] United States of America v. Detroit and Cleveland Navigation Company, 326 U.S. 236, 66 S.Ct. 75, 90 L.Ed. 38 (1945);[4] Curtis, Inc. v. United States, 225 F. Supp. 894 (D.Colo.1964), aff'd 378 U.S. 128, 84 S.Ct. 1658, 12 L.Ed.2d 744; Colorado-Arizona-California Express v. United States, et al., 224 F.Supp. 894 (D. Colorado 1963); Robbins v. United

---

1. The examiner stated in his report:

"In M and M Oil and Transp., Inc., Extension—New Mexico, 74 Mc.C. 241, Division set forth two criteria necessary to sustain a grant of a certificate, viz: (1) a need for the proposed service, and (2) that existing services are inadequate to meet the reasonable transportation requirements of the supporting shippers.

"An applicant seeking a certificate has the burden of proving that existing services are inadequate to meet the shipper's reasonable transportation requirements. Beef had not begun operations at the time of the hearing and consequently Beef's transportation needs were not definitely ascertainable. No effort was made by any of the applicant's witnesses to indicate the transportation facilities from Minden. The record indicates that Beef's production will be sold and forwarded by the same personnel as now performing these functions for Cornland. It may be concluded that the transportation needs of Beef are the same as those of Cornland. The services from Lexington, Nebr., to Chicago, Ill., and Denver, Colo., are provided by Montgomery under a certificate authorizing such transportation services from any other point in Nebraska, and consequently includes the traffic which might be forwarded from Minden. Also Frozen's services which are not being used by Cornland are available under a certificate applicable from all points in Nebraska." p. 21

"In the absence of any showing of service inadequacies, delays in transit or claims resulting from the use of existing jointline service, it may be concluded that the primary purpose of the shipper's support herein is a desire for lower rates. The record indicates that rates of existing carriers are not so high as to prevent the free flow of traffic. Consequently, the examiner concludes that a need has not been established for the proposed services and the applications should be denied." p. 24 The examiner's construction of the criterion of inadequate service makes it a mandatory finding. [Cf. Hudson Transit Lines, Inc. v. United States, 82 F. Supp. 153 (S.D.N.Y.1948), aff'd 338 U.S. 802, 70 S.Ct. 59, 94 L.Ed. 485]. Substantial authority exists for a second construction which makes "inadequacy" but one consideration along with many others. Nashua Motor Express, Inc. v. United States, 230 F.Supp. 646, 652–653 (D.N.H. 1964) citing numerous authorities. This tribunal adopts the less restricted construction as enunciated in Nashua.

2. " * * * [T]he Commission may authorize the certificate even though the existing carriers might arrange to furnish successfully the projected service."

3. "It is, of course, true that the Commission should consider the public interest in maintaining the health and stability of existing carriers, see United States v. Drum, 368 U.S. 370, 374, 82 S.Ct. 408, 7 L.Ed.2d 360, 363 (1962); but it is also true that, upon the basis of appropriate findings, 'the Commission may authorize the certificate even though the existing carrier might arrange to furnish successfully the projected service.' ICC v. Parker, 326 U.S. 60, 70, 65 S.Ct. 1490, 89 L.Ed. 2051." pp. 411–412, 88 S.Ct. p. 540.

4. "[The Commission's] function is not only to appraise the facts and to draw inferences from them, but also to bring to bear upon the problem an expert judgment or to determine from its analysis of the total situation on which side of the controversy the public interest lies." p. 241, 66 S.Ct. p. 77.

States, 204 F.Supp. 78 (E.D.Penn. 1962). In that a district court "is limited to ascertaining whether there is warrant in the law and the facts for which the Commission has done," United States v. Pierce Auto Freight Lines, 327 U.S. 515, 536, 66 S.Ct. 687, 698, 90 L.Ed. 821 (1945), this court is loathe to contradict the Commission's determination of public convenience and necessity. Interstate Commerce Commission v. Parker, supra.

■■■ Protestants also challenge what they call the Commission's "competitive equality" theory. They argue:

> The Commission seeks to establish a dangerous precedent when it proposes to insure competitive equality among shippers insofar as transportation service is concerned. In the first place, the Commission admits it is not its function to equalize a competitive situation existing among the shipping public and Plaintiffs contend there is no standard or criteria for judging its success in this regard, assuming which is not fact, such a consideration was relevant in public convenience and necessity cases. The danger of traveling such a path lies in the potential for emasculating existing carrier certificates authorizing joint-line and single-line service for the sake of nebulous 'competitive equality.'

Unfortunately plaintiffs have misunderstood the Commission's position which is to use "competitive equality" as it relates to the shipper as one factor among several others in certification cases when the Commission has in some way caused the imbalance. Here, the Commission even makes an attempt to balance "competitive equality" as a factor by considering any materially harmful effects to existing carriers which may be caused by additional grants of authority.[5] The Commission, in Howard Sober, Inc., Extension–Southern States, 64 M.C.C. 391 (1955) made this quite clear when it said:

> Although it is not our function to equalize competitive advantages dependent on local and natural causes, it is clear that competitive conditions of inequality which derive from our action in prior proceedings are entitled to be given some weight in the consideration of applications, such as this. p. 394

Division 1 went on to grant the shipper, Oldsmobile, additional single-line service in view of the fact that the Commission had granted this service to the shipper's competitors and the shipper itself had shown such a need. See also, Dallas & Mavis Forwarding Co., Inc., Extension–Montana, 64 M.C.C. 511, 514 (1955). The same situation exists here.

Plaintiffs also contend that the Commission's findings are not supported by substantial evidence of record, arguing that there was an insufficiency of evidence on which the Commission could base its findings. We disagree.

5. "Finally, we believe that a lack of adequate single-line service has placed the shipper at a disadvantage in competing for business in the highly competitive perishable food industry and emphasizes a need for additional service. In this connection and while it is not our function to equalize the competitive positions of the separate segments of the shipping public, it is clear that competitive conditions of inequality which result from our action in prior proceedings are entitled to be given some weight in the consideration of applications such as these. Compare Howard Sober, Inc., Extension-Southern States, 64 M.C.C. 391, and Dallas & Mavis Forwarding Co., Inc., Extension-Montana, 64 M.C.C. 511. We have, by our previous grants of authority, made available to the shipper's competitors single-line service from their respective plants. Now, in order to allow shipper to compete effectively and to reduce the disadvantages resulting from the use of joint-line service, we think that the grants of the authorities sought, as set forth in our findings, are warranted by evidence. Significantly, protestants have not shown how they would be materially harmed by additional grants of authority here. In the circumstances, the conclusion is amply warranted that authorization of additional single-line service will have no, materially adverse effect upon existing carriers." p. 317

The supporting shipper, Cornland, based its needs both on a desire to make additional shipments to various destinations and on its construction of a new plant which was to go into operation in September, 1965. Cornland's description of both its existing operations and the expected operations of its new plant at Minden is not controverted. From its prepared exhibit, it appears as follows:

Cornland Dressed Beef Company started its operations in the slaughter of beef animals and processing of meat on December 19, 1961 * * *. Cornland Dressed Beef Company, along with cattle feeders in the Minden area, is presently constructing a new plant at Minden, Nebraska, which is approximately 45 air miles from our plant at Lexington, Nebraska, and located approximately five miles from Minden, Nebraska. This plant will go into operation in September, 1965.

Cornland Dressed Beef Company is a locally owned Nebraska enterprise. It was organized by seventeen livestock feeders in the Lexington, Nebraska area. The company has constructed a completely new modern slaughtering plant approximately one and one-half miles east of Lexington, Nebraska. This plant slaughters approximately 65,000 head of top grade beef each year. Approximately 30 percent of the beef is being supplied by the seventeen stockholders and the balance is supplied from other stock growers in our area. Our Lexington plant operates six days a week with 57 full-time employees. We are now killing over 1,200 head of cattle per week. We are currently producing in excess of 135,000 pounds of fresh meat and packinghouse products per working day. This is in excess of 42,000,000 pounds of products per year.

The new plant being constructed at Minden will be almost identical to our present plant in capacity, production, employment and all other related items. We will ship from both plants fresh meats, offal, tankage, hides, blood, and switches, and other related meat products as more fully described in Appendix I, Sections A and C in *Descriptions in Motor Carrier Certificates*, 61 M.C.C. 209 and 766. As in any new plant, we will have many difficulties to be worked out, but one of our major obstacles will be a lack of adequate transportation facilities. Our carcass beef coolers at each plant will accommodate only 250,000 pounds of meat, or about two days' kill. Consequently, we must have immediate and dependable service if we are to keep the Minden and Lexington plants in full operation * * *.

Cornland stated that it required carriers who could handle its full line of commodities and who had substantial experience in operating refrigeration units, as follows:

Q (By Mr. Acklie) If the record would show, sir, that some of the protestants such as Frozen Food Express could not serve your company on the transportation of such products as ox tails or switches, would you tell us whether or not your company, in all instances, could use that service?

[Objection made and overruled.]

A No, we could not.

Q (By Mr. Acklie) Why, Mr. Hock?

A All products, we try to move our frozen offal products, all of them, as we can as soon as we sell them with the carcass beef.

Q And in your new sales program and expansion, will you continue that type and kind of solicitation for business?

A We expect to, yes.

Q Would that be into the same areas you now have sold, additional areas throughout the United States, or what?

A We would expect it to be throughout the United States.

In addition, Cornland indicated that it anticipated being able to sell its products in new areas if adequate transportation were available. For example, immediately following the testimony quoted by the plaintiffs on pp. 21–22 of

their brief, Cornland's witness testified as follows:

Q Would there be any change in connection with any of those states I have named? Could you tell me into any of the states how much more—

A (Interrupting) The only reason I was hesitating there, we have had some indication of people who would like to buy our meat in Louisiana and it possibly would be a little better movement into Louisiana.

Q How many trucks would you anticipate needing into Louisiana?

A We would start with one a week until we could develop a customer.

Q Would that traffic, based on what you know about it, move on a particular day of the week?

A Yes, sir.

Q Have you discussed it far enough with them to know what they would move?

A No, we have not.

Q Can you tell me or answer that question specifically with reference to the State of California on how many units you would need a week out there?

A We have had correspondence with customers in California, who have indicated a desire to have our meat, but we have not gotten down to how many loads or how much.

Q To date you have made no sales out there?

A No, sir.

■ In determining public convenience and necessity the Commission must decide if there is a public need for the proposed service. Pan American Bus Lines Operation, 1 M.C.C. 190, 203 (1936).

■ In view of Cornland's desire to ship into new areas and the substantial increase in production which would result from the operation of the new plant at Minden, an adequate showing of future need for service has been made. Such a showing is sufficient to justify authorization of additional transportation service. Curtis, Inc., Extension—Springfield, N.J., 99 M.C.C. 481, 483 (1965). Not surprisingly it was not possible to show specific future needs with the exact number of shipments which would be made into various areas. But contrary to the plaintiffs' position, this inability was not fatal to the Commission's finding of need for additional service. As the Supreme Court has stated in United States v. Detroit & Cleveland Navigation Co., 326 U.S. 236, 241, 66 S.Ct. 75, 77, 90 L.Ed. 38 (1945):

But neither uncertainties as to the future nor the inability or failure of existing carriers to show the sufficiency of their plans to meet future traffic demands need paralyze the Commission into inaction. It may be that the public interest requires that future shipping needs be assured rather than left uncertain. The Commission has the discretion so to decide.

"Substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Consolidated Edison Company of New York v. National Labor Relations Board, 305 U.S. 197, 59 S.Ct. 206, 83 L. Ed. 126.

The Supreme Court, in Consolo v. Federal Maritime Commission, 383 U.S. 607, 86 S.Ct. 1018, 16 L.Ed.2d 131 (1966), after reiterating the Consolidated definition said:

[Substantial evidence] is something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence. p. 620, 86 S.Ct. p. 1026.

The Commission's finding that a need for certain additional service had been shown is a rational determination based on substantial evidence and the Commission has applied the correct standards for determining public convenience and necessity. The Commission's order is accordingly

Affirmed.