CHEMICAL LEAMAN TANK LINES, INC., Plaintiff,

v.

UNITED STATES of America and Interstate Commerce Commission, Defendants,

and

Fleet Transport Company, Inc., and Schwerman Trucking Co., Intervening Defendants.

Civ. A. No. 4106.

United States District Court, D. Delaware.

May 25, 1972.

Andrew G. T. Moore, 2nd, Killoran & Van Brunt, Wilmington, Del., Leonard A. Jaskiewicz and Ronald N. Cobert, of Grove, Jaskiewicz & Gilliam, Washington, D. C., for plaintiff.

F. L. Peter Stone, U. S. Atty., Wilmington, Del., Richard W. McLaren, Asst. Atty. Gen., Washington, D. C., Gregory B. Hovendon, Department of Justice, Washington, D. C., for defendant United States of America.

Charles H. White, Jr., Interstate Commerce Commission, Washington, D. C., for defendant Interstate Commerce Commission.

H. James Conaway, Jr., and Richard H. May of Young, Conaway, Stargatt & Taylor, Wilmington, Del., Wade Livingston, Vice President, Fleet Transport Co., Nashville, Tenn., James R. Ziperski, Schwerman Trucking Co., Milwaukee, Wis., for intervening defendants.

## OPINION

Before BIGGS, Senior Circuit Judge, and LATCHUM and STAPLETON, District Judges.

STAPLETON, District Judge.

This is an action to set aside a report and order of the Interstate Commerce Commission authorizing the intervening defendants, Fleet Transport Company, Inc., of Atlanta, Georgia, and Schwerman Trucking Company of Milwaukee, Wisconsin, to operate as common carriers by motor vehicle, transporting certain specified chemical products in bulk from Cartersville, Bartow County, Georgia, to points in North Carolina, South Carolina, Tennessee and Alabama. The plaintiff, Chemical Leaman Tank Lines, Inc., is a motor common carrier and was the sole protestant before the Commission.

The intervening applicants are irregular-route motor common carriers of various bulk commodities, and are presently authorized to transport the commodities here under consideration from Cartersville to points in Florida, Mississippi, and to that part of Alabama on the south of U. S. Highway 278, and sodium silicate and potassium silicate, dry, in bulk, from points in Bartow County, Georgia, to points in Alabama, Florida, Mississippi, North and South Carolina, and Tennessee (except Elizabethton and Kingsport). Each applicant operates a sizable fleet of equipment suitable for the proposed service, and each maintains a terminal at Atlanta.

The supporting shipper, Chemical Products Corporation ("CPC"), produces solutions of sodium silicate, potassium

silicate, ammonium sulfide, sodium sulfhydrate, and orthodichlorobenzene. It ships these commodities, in bulk, from its Cartersville plant to a wide variety of customers located throughout the destination territory. Shipper's sales force is actively soliciting additional business, and statewide authority is sought in order to enable service to present and future customers which include manufacturers, brokers, and distributors. Rail service is utilized on less than 8 percent of all shipments because many customers are not located on sidings, and because of the minimum volumes and additional time required for such deliveries. The remaining shipments are transported by protestant Chemical Leaman which is the only motor carrier authorized to provide service from shipper's plant to the involved destination territory. CPC has experienced numerous problems with that carrier's service, including instances of equipment shortages, improperly cleaned equipment, and failure to comply with shipping instructions. The shipper operates in competition with E. I. duPont de Nemours & Co. and Philadelphia Quartz Company, both of which produce sodium and potassium silicates at plants located in Richmond County, Georgia. Until the latter part of 1969, protestant, Chemical Leaman, was the only carrier authorized to provide service to the involved destination territory for the shipper and its two competitors. Since that time, however, CPC has felt itself at a competitive disadvantage because, while it has no alternate sources of motor transportation, these other two firms have had available the services of three additional carriers: Fleet and Schwerman, the applicants herein, and Central Transport, Incorporated.

CPC's plant capacity has increased by 50 percent since 1947 and is currently in excess of 20,000 tons a year. The Cartersville facility is operated 24 hours-a-day, 7 days-a-week, and further increases in production capacity are forecast. Shipper expects that the steady increases it has experienced in production, sales, and the amount of traffic to the destination territory will continue indefinitely. Although CPC would continue to tender traffic to protestant Chemical Leaman if the authority sought is granted, it avers that it will be forced to consider some form of private carriage should this application be denied.

Protestant Chemical Leaman maintains a major terminal at Atlanta and operates a large fleet of equipment suitable for the transportation of shipper's products. For several years, protestant has stationed a unit of equipment at Cartersville, and additional equipment would be made available if required. During the first 11 months of 1969, protestant transported 263 loads for the supporting shipper from Cartersville to points in the destination territory, which traffic accounted for revenues of $50,000. Chemical Leaman's 1968 operating revenue was $69,390,000.

After expressly finding the foregoing facts, the Commission concluded that the public convenience and necessity required that the applicants be authorized to transport the liquid commodities specified in the applications to virtually all the destinations therein set forth.[1] In a section of its report entitled "Discussion and Conclusions" the Commission expressed the following views:

"In our opinion, applicants have set forth sufficient evidence to establish a need for service to the extent set forth in our findings. The supporting shipper's plant capacity has increased substantially in recent years and is currently in excess of 20,000 tons a year. This resulted in more than 263 truckloads to destinations within the involved area in 1969. Its Cartersville facility is now operated 24 hours-a-day, 7 days-a-week, and further increases in plant capacity are forecast. While shipper's current customers include manufacturers, brokers, and distributors, its sales force is actively soliciting additional busi-

---

1. The Commission declined to grant the remainder of the authority requested.

ness, and steady increases in production, sales, and the amount of traffic shipped to the destination territory are expected to continue indefinitely. In contrast to its two major competitors which are served by four carriers, CPC has only protestant's service available, and that service has been criticized. Unless the proposed services are made available, shipper has indicated it will have no alternative but reluctantly to consider private carriage. We conclude that shipper has a need for additional service which can best be met by the spur of competition, and we accordingly favor the limited grants of additional authority set forth below. In accordance with the evidence of record, and because complete grants of the applications would result in some duplication of authority, the authority granted will be limited to the transportation of the *liquid* commodities sought, and will uniformly preclude service to those points in Alabama *on* U.S. Highway 278 which already can be served by applicants, as well as to points in the commercial zones of Kingsport and Elizabethton, Tenn."

The plaintiff protestant makes several arguments in support of the relief sought. First, it asserts that the Commission's report does not adequately disclose the rationale which led the Commission to its ultimate conclusion. This is so, the protestant claims, because the report substitutes the phrase "spur of competition" for a reasoned analysis of how and in what way the spur of competition "will serve the public convenience and necessity," and because it fails to include any reasoned analysis pertaining to the potential impact upon protestant of the authority sought. Second, the protestant asserts that the Commission failed to apply the proper legal standards. In this argument protestant espouses two propositions: (1) that lack of competition in and of itself will not justify the granting of a certificate of public convenience and necessity and (2) that a finding of inadequate existing service is a prerequisite to the issuance of such

a certificate. Finally, the protestant argues that the Commission's ultimate finding regarding public convenience and necessity is unsupported by substantial evidence.

With respect to protestant's first argument, the following observations of the court in Davidson Transfer & Storage Co. v. United States, 42 F.Supp. 215, 218–219 (E.D.Pa.1941), aff'd, 317 U.S. 587, 63 S.Ct. 31, 87 L.Ed. 481 (1942) are equally appropriate here:

" . . . The Commission has found and stated basic findings of fact which should and do lead to its ultimate conclusion of fact This is sufficient under the authorities. See United States v. Baltimore & O. R. Co., 293 U.S. 454, 464, 465, 55 S.Ct. 268, 79 L.Ed. 587, and compare Florida v. United States, 282 U.S. 194, 215, 51 S.Ct. 119, 75 L.Ed. 291. . . . In the Baltimore & O. Railway case [293 U.S. 454, 55 S.Ct. 273, 79 L.Ed. 587], Mr. Justice Brandeis used the following language which is illuminating in this connection: 'In the Florida Case [Florida v. United States, supra] the legal distinction was pointed out between what may be termed quasi jurisdictional findings, there held to be indispensable, and the "complete statement of the grounds of the Commission's determination" which was declared in Beaumont, S. L. & W. Ry. Co. v. United States, 282 U.S. 74, 86, 51 S.Ct. 1, 75 L.Ed. 221, to be desirable for a proper consideration of the case in the courts. The lack of such a complete statement, while always regrettable, because unnecessarily increasing the labor of the reviewing court (compare Virginian Ry. Co. v. United States, 272 U.S. 658, 675, 47 S.Ct. 222, 71 L.Ed. 463), is not fatal to the validity of the order.'

The report of the Commission might be regarded as subject to some criticism in that it fails to state clearly the complete reasons for the conclusion and thus fails to present a 'complete statement of the grounds of the Commission's determination', but it

cannot be set aside as lacking in a statement of the basic findings which underlie its ultimate determination."

■ We agree with the protestant that "the reviewing courts have a right to know the basis for the Commission's ruling," Central & Southern Motor Freight Tariff Association v. United States, 273 F.Supp. 823 (D.Del.1967), and that the Commission must give "clear indication that it has exercised the discretion with which Congress has empowered it." Burlington Truck Lines, Inc. v. United States, 371 U.S. 156, 167–168, 83 S.Ct. 239, 245, 9 L.Ed.2d 207 (1962). In this case, however, we conclude that the Commission's report supplies us with sufficient indicia of its reasoning and clearly evidences a permissible exercise of agency discretion.

With respect to the two deficiencies particularized by the protestant, we find it apparent from the report as a whole (1) that the Commission felt that there was a steadily increasing need for service and that the filling of this need for additional service through the authorization of competing carriers would produce better overall service to CPC than would be produced by allowing the sole existing carrier to attempt to meet the increasing demand and (2) that a grant of the authorization requested would not endanger the operation of the protestant. While the Commission did not analyze this latter point in the section of its report entitled "Discussion and Conclusions," the report as a whole clearly indicates that the Commission exercised its discretion with respect to the potential impact upon protestant. The Commission in its findings of fact expressly took note of protestant's "fears" about "diversion of this traffic" and of its claim that "recent grants of authority to applicants to serve shipper's competitors have resulted in diversion of all of such competitor's traffic." The Commission found, however, that the demand for service was increasing, that CPC would continue to tender traffic to protestant if the authority sought were granted, and

that protestant's revenues from this source constituted a very small fraction of its total operating revenue. In short, it is apparent from the finding of these facts and from the Commission's ultimate conclusion with respect to the public convenience and necessity that the Commission considered the potential impact upon protestant and concluded that, in the overall context of the case, it did not warrant denial of the authority sought.

Protestant's second contention is that the Commission simply took the wrong legal approach to the question before it. Protestant suggests that the Commission did not follow the appropriate guidelines which are articulated as follows in Allied Van Lines Co. v. United States, 303 F.Supp. 742, 747 (C.D.Cal.1969):

"The duty of the I.C.C. is to consider the facts presented by both sides and then make a determination: 1) whether a new operation will serve a useful public purpose, responsive to a public demand or need; 2) whether this purpose can and will be served as well by existing carriers; and 3) whether authorization of the proposed service will endanger or impair the operations of the existing carriers contrary to the public interest. Pan-American Bus Lines Operation, 1 M.C. C. 190, 203 (1936)."

While the Commission's report cites neither the *Allied* case nor its *Pan-American* decision, it is apparent in our judgment that the Commission answered the first inquiry therein specified in the affirmative and the last two in the negative, weighed these three relevant factors, and properly concluded that the public convenience and necessity required it to grant the authority sought.

The Commission rested its decision on more than the mere fact that protestant currently had a monopoly. It found itself confronted with the following situation:

1. The sole shipper from the point of origin had a steadily increasing need for service.

2. This shipper marketed fungible commodities in a competitive market, and the quality of service to customers at the point of destination was, therefore, of grave concern to the shipper.

3. The shipper was wholly dependent upon one carrier.

4. The shipper's competition, as a result of prior Commission actions, had call upon the facilities and equipment of four carriers.

5. If the authority requested were not granted, the shipper would reluctantly consider private carriage.

6. The requested authority could be granted without a substantial adverse impact upon the currently authorized carrier.

7. The past service of the currently authorized carrier, while "reasonably adequate," had presented the shipper with numerous problems.

There are inherent advantages to a shipper in having service available from more than one carrier. The Commission long ago recognized competition as "the best known spur" to improved service, Pan-American Bus Lines Operation, 1 M. M.C. 190 (1936), and has frequently relied upon a lack of competition as an important factor in determining the public convenience and necessity.

As the agency explained in Santa Fe Trail Stages, Inc., Common Carrier Application, 21 M.C.C. 725, 748 (1940), there are situations where:

" . . . a dominant existing service without any effective competition is not all that experience has taught that the public needs for its best interests and consequently is not an adequate service.

.    .    .    .    .    .

Regulated monopoly is not a complete substitute for competition. The latter fosters research and experimentation and induces refinements in service

which are not likely otherwise to be accomplished."

And in M. R. & R. Trucking Co., Extension Birmingham, 105 M.C.C. 69, 80 (1967) the Commission reiterated:

"In keeping with the national transportation policy the Commission is required to promote an adequate and efficient transportation service and, accordingly, we must consider such factors as the existence of sufficient carrier capacity to encourage competition, incentives for real innovation and improvement in service to the public, and constraint against monopolistic motor carrier operations."

The courts also have found lack of competition to be a relevant and important factor in this context. E. g., Davidson Transfer & Storage Co. v. United States, 42 F.Supp. 215, 219 (E.D.Pa. 1942), aff'd, 317 U.S. 587, 63 S.Ct. 31, 87 L.Ed. 481 (1942).

Moreover, the position of the shipper vis-a-vis his competition is a proper factor to be weighed in proceedings of this character at least where the Commission by prior action has in some way caused an imbalance. Frozen Food Express, Inc. v. United States, 301 F. Supp. 1322, 1326 (N.D.Texas 1969). Finally, as plaintiff, of course, concedes, increasing demand for service, absence of substantial adverse effect on presently authorized carriers, and the character of existing service are also proper factors to be considered.

In short, all of the factors listed above were properly considered and weighed by the Commission.

Protestant claims that the character of its past service was not a factor in the Commission's decision and that the Commission would not have properly granted the authority sought without finding some specific fault with that service. We think it clear that protestant's past service did play a role in the Commission's decision.[2] If the contrary

2. Protestant here relies upon the fact that the Commission in the "discussion" section of its report stated only that protestant's "service has been criticized."

be assumed, however, this would not change our ultimate conclusion. The cases which stress the importance of inadequacy of existing facilities as a factor must be read in the context of the ultimate issue—public convenience and necessity. In Hudson Transit Lines v. United States, 82 F.Supp. 153, 157 (S.D.N.Y.1948), for example, the court observed:

"... [Consideration of] inadequacy of existing facilities as a basic ingredient in the determination of public 'necessity' . . . does not mean that the holder of a certificate is entitled to immunity from competition under any and all circumstances. Chesapeake & O. R. Co. v. United States, 283 U.S. 35, 51 S.Ct. 337, 75 L.Ed. 824. The introduction of a competitive service may be in the public interest where it will secure the benefits of an improved service without being unduly prejudicial to the existing service. Interstate Commerce Commission v. Parker, supra [326 U.S. 60, 65 S.Ct. 1490, 89 L.Ed. 2051]. . . ."

Where the first six factors listed above are found to be present we believe the Commission, without finding specific deficiencies in the protestant's past services, may quite properly conclude, based on its experience and expertise, that the authorization of additional carriers to fill a need for additional service will best serve the public interest. *Cf.* Davidson Transfer & Storage Co. v. United States, 42 F.Supp. 215 (E.D.Pa.1942), aff'd, 317 U.S. 587, 63 S.Ct. 31, 87 L.Ed. 481 (1942); Campus Travel, Inc. v. United States, 224 F.Supp. 146 (S.D.N.Y.1963); Frozen Food Express, Inc. v. United States, 301 F.Supp. 1322 (N.D.Texas 1969); Midwest Emery Freight Systems, Inc. v. United States, 293 F.Supp. 403 (N.D.Ill.1968). Upon the basis of

such findings, "the Commission may authorize the certificate even though the existing [carrier] . . . might arrange to furnish successfully the projected service." United States v. Dixie Highway Express, 389 U.S. 409, 411, 88 S.Ct. 539, 540, 19 L.Ed.2d 639 (1967).

■ Finally, we conclude that there is substantial evidence to support the findings and conclusions of the Commission. The United States Supreme Court has described the substantial evidence rule as follows:

"Section 10(e) of the Administrative Procedure Act . . . gives a reviewing court authority to 'set aside agency action, findings, and conclusions, found to be . . . unsupported by substantial evidence. . . .' We have defined 'substantial evidence' as 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion'. . . . 'I]t must be enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn from it is one of fact for the jury.' " Consolo v. Federal Maritime Commission, 383 U.S. 607, 619, 86 S. Ct. 1018, 1026, 16 L.Ed.2d 131 (1966). The record in this case provides this type of support for the conclusions reached.

The protestant here argues that there is no substantial evidence on two crucial points: the volume and destinations of the freight which the shipper would tender the applicants and the character of the present service provided by it. A more accurate articulation of this argument in our judgment would be that the evidence on these points lacks what protestant considers to be the requisite specificity.

It is true that CPC took the position before the Commission that the competitive nature of its market precluded dis-

---

We conclude that protestant's argument interprets this statement out of context. The Commission, in its findings of fact, expressly found that there had been numerous problems with protestant's service. The only satisfactory explanation for this is that the Commission accepted the testimony of the shipper on this point and considered the existence of service problems to be a factor relevant to its decision.

closure of confidential sales data and, therefore, submitted no specific estimates of traffic to be tendered to the applicant under the proposed operation.[3] CPC did tender evidence, however, that (1) its plant capacity has increased 50 percent since 1947, (2) this facility is operating around the clock, 7 days-a-week, (3) CPC plans to expand its production capacity, (4) volumes shipped to the destination territory have steadily increased over the last eight years and (5) present indications are that this increase in volume of traffic shipped to the destination territory will continue indefinitely. The crucial issue in this portion of the case was the future need of the shipper. This situation was not unlike that confronted in Frozen Food Express, Inc. v. United States, 301 F. Supp. 1322 (N.D.Texas 1969) where the court observed:

> "Not surprisingly it was not possible to show specific future needs with the exact number of shipments which would be made into various areas. But contrary to the plaintiffs' position, this inability was not fatal to the Commission's finding of need for additional service. As the Supreme Court has stated in United States v. Detroit & Cleveland Navigation Co., 326 U.S. 236, 241, 66 S.Ct. 75, 77, 90 L.Ed. 38 (1945):
>
> > But neither uncertainties as to the future nor the inability or failure

of existing carriers to show the sufficiency of their plans to meet future traffic demands need paralyze the Commission into inaction. It may be that the public interest requires that future shipping needs be assured rather than left uncertain. The Commission has the discretion so to decide."

Under the circumstances of this case, we cannot say that the Commission erred in accepting the evidence presented as establishing the need for additional service to the destination territory.

CPC also submitted evidence on the character of the present service as follows:

> "The services of Chemical Leaman in the areas here involved have been, on the whole, reasonably satisfactory. However, Chemical Leaman's services have not been entirely satisfactory by any means. We have had numerous problems with the services of that carrier resulting from such problems as equipment shortages during particular times, improperly cleaned equipment, disregarding our shipping instructions and other instances of what we definitely consider to be inadequate service. . . ." (V.S. p. 6.)[4]

The Commission may well have considered the evidence regarding the lack of carrier competition at CPC's Cartersville plant as additional evidence tending

---

3. CPC's witness explained its position as follows:
    "The marketing of Sodium Silicate solutions is extremely competitive with a continuing battle between our company and the other two aforesaid companies listed for companies throughout the Southeast. (V.S. p. 2).

    *    *    *    *    *

    . . . We have a vast number of industrial manufacturers and numerous distributors located throughout the destination territory, which we are presently attempting to serve through the use of the one motor carrier available to us. However, due to the extremely competitive position of my company, I cannot afford to name the individual companies or the exact locations of our customers. (V.S. p. 5.)

*    *    *    *    *

If we gave the precise tonnage moving into the territory involved, we would be furnishing confidential information that we deem inadvisable. (Collier, R.V.S. p. 3.)"

4. The protestant relied before the Commission on the concession of "reasonably satisfactory" service as well as on the testimony of its Assistant Traffic Manager that its service had produced "numerous expressions of appreciation from the shipper" and that "the type of service offered by Chemical Leaman . . . [had] been of the type that justifies . . . [such] commendations." Protestant did not, however, submit evidence that the shipper had not experienced numerous problems with its service.

112

to lend credence to the claim that the present service could be better. In any event, the Commission concluded in its findings of fact that "CPC has experienced numerous problems with . . . [Chemical Leaman's] service, including instances, however undetailed, of equipment shortages, improperly cleaned equipment, and failure to comply with shipping instructions." While more detailed evidence on the point might have made CPC's evidence more compelling, here also we cannot say that the Commission erred in believing the evidence in fact produced.

In summary, we conclude that the record in this case entitled the Commission to find, as it did, that the public convenience and necessity required a grant of the authority sought. The Commission's action must be sustained.

Submit order.